**DIGENE CORPORATION, Plaintiff,**

v.

**VENTANA MEDICAL SYSTEMS, INC. and Beckman Coulter Inc., Defendants.**

**No. CIV.A.01–752 KAJ.**

United States District Court, D. Delaware.

May 7, 2004.

Richard D. Kirk, Esq., Morris James Hitchens & Williams LLP, Wilmington, DE, for plaintiff Digene Corporation. Of Counsel: Marc R. Labgold, Esq. and Kevin M. Bell, Esq., Patton Boggs LLP, McLean, VA, Richard J. Oparil, Esq., Patton Boggs LLP, Washington, DC.

Richard H. Morse, Esq., Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, for defendant Ventana Medical Systems, Inc. Of Counsel: Ron E. Shulman, Esq. and Roger J. Chin, Esq., Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

Allen M. Terrell, Jr., Esq., Richards, Layton & Finger, P.A., Wilmington, DE, for defendant Beckman Coulter, Inc. Of Counsel: Paul E. Rafferty, Esq., Sheppard, Mullin, Richter & Hampton LLP, Costa Mesa, CA.

## POST–TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

JORDAN, District Judge.

## I. INTRODUCTION

This is a patent infringement case. On November 19, 2001, plaintiff Digene Corporation ("Digene") filed a complaint of patent infringement against defendant Ventana Medical Systems, Inc. ("Ventana"). (Docket Item ["D.I."] 1.) Digene subsequently amended its complaint twice, adding additional counts against Ventana and adding an additional defendant, Beckman Coulter, Inc. ("Beckman"), to the lawsuit. (D.I.119, 174.) The patents-in-suit are U.S. Patent No. 4,849,332, entitled "Human Papilloma Virus 35 Nucleic Acid Hybridization Probes and Methods for Employing the Same" (issued July 18, 1989) ("the '332 patent") and U.S. Patent No. 4,849,331, entitled "Human Papilloma Virus 44 Nucleic Acid Hybridization Probes and Methods for Employing the Same" (issued July 18, 1989) ("the '331 patent"). (Attached to D.I. 1 as Exs. A and B.) The patents relate to biological material and claim a type of human papilloma virus ("HPV"), HPV 35 and 44, respectively. (See '332 patent, col. 17 I. 30 to col. 24 I. 15; '331 patent, col. 17 I. 15 to col. 22 I. 67.) The patents also claim methods of using deoxyribonucleic acid ("DNA") sequences derived from HPV 35 and 44, respectively, in a probe to detect the presence of HPV. (Id.)

Beckman and Ventana (collectively, the "Defendants") filed on December 27, 2002 Motions to Compel Arbitration of Digene's claims against them. (D.I.125, 128.) Beckman asserted a right to arbitrate Digene's claims against it based on an April 1, 1990 cross-license agreement ("CLA") involving Digene's predecessor in interest, Life Technologies, Inc. ("LTI"), and another company, Institut Pasteur ("IP"), and on the basis of retracted statements made by Digene to the court as to Beckman's status as a party to the CLA. (D.I. 129 at 4, 6–10; D.I. 146 at 1–7.) Ventana also asserted a right to arbitrate Digene's claims against it based on those same retracted statements by Digene and on a purported acquisition of Beckman's assets, including any rights Beckman may have under the CLA. (D.I. 126 at 3–10; D.I. 144 at 3–12.) In addition, both Beckman and Ventana assert a right to arbitrate Digene's claims against them stemming from a June 7, 1991 sublicense to Beckman by IP ("IP/Beckman sublicense") under the CLA, to which Ventana has alleged it is the successor in interest. (See D.I. 126 at 2, 3–10; D.I. 129 at 1, 4, 6–10; D.I. 144 at 3–10; D.I. 146 at 1–7.)

After considering Defendants' Motions to Compel Arbitration and hearing the parties at oral argument on March 5, 2003 (see D.I. 162), I issued an Order explaining why I felt that a more complete evi-

dentiary record was necessary to render a decision on whether and to what extent Digene's claims against Beckman and Ventana are arbitrable. (D.I. 176 at 2.) The parties were directed to take the necessary discovery in order to try the issues of the right to and scope of arbitration, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4. A bench trial on the scope and extent of claims covered by the CLA as they relate to Digene's allegations against Beckman and Ventana in its Second Amended Complaint was held from January 22–24, 2004. (*See* D.I. 246–248.)[1]

The following post-trial findings of fact and conclusions of law are issued pursuant to Federal Rule of Civil Procedure 52(a).[2]

## II. FINDINGS OF FACT

### A. Uncontroverted Facts

1. Digene, a corporation organized under Delaware law, has its principal place of business in Gaithersburg, Maryland. (D.I. 244 § III ¶ 1.)[3]

2. Ventana, a corporation organized under Delaware law, has its principal place of business in Tucson, Arizona. (*Id.* ¶ 2.)

3. Beckman, a corporation organized under Delaware law, has its principal place of business in Fullerton, California. (*Id.* ¶ 3.)

4. The '331 and '332 patents were originally assigned to Life Technologies, Inc. ("LTI"). (*Id.* ¶ 4.)

5. Digene acquired LTI's entire right, title and interest in its HPV business, including LTI's rights to the '331 and '332 patents and its rights under the CLA, pursuant to an Agreement of Purchase and Sale of Assets, dated December 19, 1990. (*Id.* ¶ 5; *see also* DX 138; DX 286 at 2–3.)[4]

6. On June 7, 1991, IP and Beckman entered into an agreement whereby IP sublicensed to Beckman certain LTI patent rights and virus types related to HPV probes under the CLA (the "IP/Beckman Sublicense"). (*Id.* ¶ 6; *see also* DX 320.)

### B. Beckman's Relationship with IP Prior to the CLA

7. IP owned two patents, known as the Kourilsky and Avrameas patents, which covered certain DNA probe technology. (DX 323; Tr. at 60:19–62:12.) On October 30, 1985, IP, Beckman, and Diagnostics Pasteur[5] ("DP") entered into an agreement that licensed[6] this technology to

---

1. The transcript from the bench trial will be cited as "Tr." herein.

2. Throughout these Findings and Conclusions, I have adopted without attribution language suggested by one side or the other in this dispute. In all such instances, the Finding or Conclusion in question has become my own, based upon my review of the evidence and the law.

3. D.I. 244 is the Pretrial Order and contains a recitation of uncontroverted facts.

4. The Defendants' admitted trial exhibits are cited as "DX ___" and Digene's admitted trial exhibits are cited as "PX ___" throughout these Findings and Conclusions.

5. At one time, Diagnostics Pasteur ("DP") was the commercial business operation arm of IP. However, in the early 1980s, IP sold Diagnostics Pasteur to a French pharmaceutical company because IP no longer wanted to be in commercial business operations. (Tr. at 69:14–24.)

6. The term of the license agreement was for the life of the patents, and, even though the license was initially nonexclusive, Beckman felt that as long as it complied with certain provisions, including sponsoring research, that it had an exclusive license. (Tr. at 73:8–19.)

Beckman, to use in connection with HPV analytes. (*Id.*; Tr. at 73:8–14, 76:3–5.)

8. A few years later, in August 1988, IP decided that it wanted to maximize the commercial value of the technology covered by the Kourilsky and Avrameas patents by licensing them to third parties. To that end, IP approached Beckman for its consent and proposed that Beckman and IP consider a new relationship apart from the October 30, 1985 agreement. (Tr. at 74:14–75:6.)

9. Beckman was receptive to redefining its relationship with IP, and asked for a broader license to use the technology covered by the Kourilsky and Avrameas patents with additional analytes, not just HPV. Beckman also wanted IP to exchange intellectual property rights with LTI in the HPV field, the goal being that Beckman would then receive a sublicense from IP to LTI's HPV patents. (Tr. at 75:11–19, 76:3–21.)

10. With these objectives in mind, IP and Beckman envisioned a new deal, structured by a series of three documents. First, IP and Beckman would enter into a Novation Agreement, wherein Beckman would receive a broad, nonexclusive license to the Kourilsky and Avrameas patents. (Tr. at 77:2–78:2.) Second, IP and LTI would enter into the CLA, in order to exchange certain intellectual property rights pertaining to their respective HPV patents. (*Id.*) Finally, IP and Beckman would enter into an agreement wherein Beckman would receive a license to IP's HPV patents and a sublicense to LTI's HPV patents. (*Id.*)

11. The Novation Agreement contemplated by Beckman and IP was signed on March 18, 1990, giving Beckman a non-exclusive license covering a broader range of analytes than in the October 30, 1985 agreement. (DX 68; Tr. at 83:17–84:9, 85:1–8.)

12. The Novation Agreement contained a requirement for IP to sublicense to Beckman any license rights it obtained from LTI. (DX 68; Tr. 86:16–87:6, 126:20–127:6, 127:19–128:5.) Once the first of the three documents that Beckman and IP contemplated was completed, Beckman believed that IP would undertake the CLA with LTI and then enter into the IP/Beckman Sublicense. (Tr. at 85:17–86:16.)

## C. Drafting the CLA

13. LTI and IP, with input from Beckman, began drafting the CLA in November 1989, prior to IP and Beckman signing the Novation Agreement. Richard Schifreen of LTI, Alain Gallochat of IP, and Arnold Grant of Beckman were all involved in the drafting and negotiating process of the CLA. (DX 141; *see also* Tr. at 79:3–80:1, 87:15–23, 88:5–9 92:2–12.)

14. Beckman's main motivation for urging the creation of the CLA was that, in order for Beckman to create and market a viable commercial product, the product had to contain both the IP and LTI HPV types. (Tr. at 76:10–15.)

15. LTI and IP reached a basic agreement about the structure of the CLA in January 1990, around the same time that Beckman and IP were finalizing the Novation Agreement. (Tr. at 88:10–14.) In general, LTI and IP agreed to exchange rights to their respective HPV patents, royalty free, and also agreed that IP could grant sublicenses to Beckman and DP. (*Id.*) LTI would also have the right to grant a sublicense to Toray Industries, Inc., a Japanese company. (Tr. at 88:15–89:5.)

16. LTI, IP, and Beckman circulated a draft of the CLA in February 1990. (DX 26; Tr. at 89:16–90:11.) At that time, Beckman was focused on seeing that IP received the right under the CLA to grant

Beckman a sublicense of LTI's HPV patents. (Tr. 91:5–16, 93:20–94:3.) However, Beckman was not concerned with becoming a party to the CLA, nor had any party involved in the drafting and negotiations suggested that Beckman become a party to the CLA. (*Id.*)

17. The CLA was eventually executed in late July or early August 1990, but back-dated to April 1, 1990. (*Id.*; Tr. at 112:17–114:4, 195:11–196:6.)

### D. The Language of the 1990 Cross-License Agreement

18. The introductory paragraph of the CLA states that it is an "[a]greement made as of the first day of April, 1990, by and among Life Technologies, Inc. [LTI]...and Institut Pasteur [IP]...." (DX 142 at 1.) LTI and IP are the only two parties named in the introduction. (*Id.*)

19. Paragraph 1 of the CLA recites LTI's grant to IP as follows:

LTI hereby grants to IP the non-exclusive, paid-up, worldwide right and license, to use the LTI Patent Rights and the LTI Virus Types [relating to HPV types 31, 35, 43 and 56 [7]] with rights to develop, make and have made, use, sell, market and otherwise commercially exploit products and services using the LTI Patent Rights and the LTI Virus Types. IP may not grant any sublicense to use the LTI Patent Rights and the LTI Virus Types except for sublicenses to Beckman Instruments, and its affiliates controlled by, controlling or under common control with Beckman Instruments, Diagnostics Pasteur and its affiliates controlled by, controlling or under common control with Diagnostics

Pasteur. Any sublicense to said parties shall be of equal scope to the license granted herein to IP and shall contain a prohibition on further sublicenses. Beckman Instruments and Diagnostics Pasteur accept the terms and conditions of the present Agreement by signing hereunder....

(DX 142 at 3, ¶ 1.)

20. Paragraph 11 of the CLA contains the following arbitration clause:

In the event of a dispute or controversy between the parties rising out of this Agreement, this Agreement shall remain in full force and effect and all terms hereof shall continue to be complied with by both parties. If such dispute or controversy cannot be settled by Agreement between the parties, it shall be submitted to arbitration pursuant to the rules of the American Arbitration Association. Arbitration shall be conducted in New York, New York. The decision of the arbitrator shall be binding upon the parties, and may be entered as a judgment by any court of competent jurisdiction. LTI and IP hereby submit to the jurisdiction of state and Federal courts in the State of New York with respect to all matters covered by this Agreement.

(DX 142 at 11, ¶ 11.)

21. The CLA also contains an integration clause in Paragraph 13 which states as follows:

This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof. There are no oral statements, representations, warranties, undertakings or agreements between the parties except as provided

---

**7.** The CLA only pertained to LTI's rights under the '332 patent, which claims HPV 35, and did not include the '331 patent, which claims HPV 44. (*See* DX 142 at 1.) Furthermore, Toray Industries, Inc., a Japanese company to whom LTI had previously licensed rights to its patents, consented to LTI granting IP a worldwide non-exclusive license under the LTI Patent Rights. (*Id.*)

herein. This Agreement may not be amended or modified in any respect except by written instrument signed by the parties to this agreement. (DX 142 at 11–12, ¶ 13.)

22. Casey Eitner, LTI's Vice President, signed the CLA on behalf of his company, and Jean Castex, IP's Financial and Administrative Director, signed for IP. (DX 142 at 13.) John P. Wareham, Beckman's Vice President, signed the CLA for Beckman and Christian Policard signed on behalf of Diagnostics Pasteur. (*Id.*)

23. The word "Accepted:" appears above Mr. Wareham's and Mr. Policard's signature block, but it does not appear above Mr. Eitner's and Mr. Castex's signatures.[8] (*Id.*)

### E. The Circumstances Surrounding Execution of the CLA

24. Arnold Grant, Beckman's assistant general counsel, testified on behalf of Beckman at trial. (Tr. at 56:12–22.) Mr. Grant has worked at Beckman for over 19 years and is presently responsible for providing legal advice to Beckman's biomedical research division. (Tr. at 56:23–57:4.) Mr. Grant managed Beckman's involvement with respect to revising and negotiating the CLA. (*See supra* at ¶ 14; Tr. at 88:4–9.)

25. Beckman understood that it did not receive a sublicense from IP under the CLA. (Tr. at 214:18–20.) As Mr. Grant testified, Beckman "got no license under the cross license. We got no rights to use the LTI technology. We got no rights to use the Pasteur technology. That had to come under the [1991 IP/Beckman] sublicense." (Tr. at 291:21–292:2.) Beckman's

main interest in the CLA was that LTI's intellectual property rights in HPV were being licensed to IP so that IP could then sublicense those rights to Beckman. (Tr. At 93:2–24; 93:15–19.)

26. On March 30, 1990, Denis Lesire, IP's General Counsel, sent a letter to Mr. Grant, stating that "DP and Beckman will sign the agreement [CLA], for approval. We deem this signature appropriate: some provisions directly affect DP and Beckman interests." (DX 330; *see also* Tr. at 94:7–96:2.)

27. Mr. Grant responded to Mr. Lesire's letter on April 6, 1990, stating that, while he did not "see any need for Beckman and DP to sign an agreement between [IP] and LTI, [he] also [had] no objection to recommending signature to Beckman's management." (DX 48; *see also* Tr. At 107:8–12, 108:22–109:10.)

28. In that same letter, Mr. Grant suggested that New York law be controlling law for the CLA, because New York's "facilities, courts and law, etc. are sophisticated enough to understand and deal with a transaction involving two French companies, two U.S. company (Maryland and California) and a Japanese company." (DX–48; Tr. at 112:4–12.) The companies to which Mr. Grant referred were IP, DP, LTI, Beckman, and Toray, respectively. (Tr. at 112:13–16.)

29. Mr. Grant never asked Mr. Lesire, or anyone else at IP, whether there was any significance or meaning to Beckman and DP signing the CLA "for approval." (Tr. at 96:14–97:8, 235:8–236:6.) Furthermore, Mr. Grant's letter to Mr. Lesire did not use the word "party," it just said that

---

8. Mr. Grant testified that he understood the term "accepted," when used in connection with a signature block, to mean that the signatory becomes a party to the agreement. (Tr. at 100:15–101:10.) However, as discussed more fully *infra* at n. 12, Mr. Grant's understanding of the meaning of the words "accepted" and "approved" are irrelevant to the issue of whether Beckman is a party to the CLA.

Mr. Grant would recommend signing the CLA to Beckman's management. (DX 48.)

30. However, Mr. Grant testified that he understood Mr. Lesire's letter as asking Beckman to become a party to the CLA, and that Mr. Grant asked Beckman's senior management to approve Mr. Lesire's request that Beckman for become a party to the CLA. (Tr. at 98:10–13, 110:7–16.) Mr. Grant was unable to find any contemporaneous documentation reflecting his communications with Beckman management on this subject in his files. (Tr. at 110:17–23; 111:1–12.)

31. Even though Mr. Grant acknowledged that the CLA was not revised to his satisfaction because there were ambiguities in the language, or as he put it, that "confusion" and "tension" existed in the document [9], he still felt that the CLA accomplished Beckman's business objective of getting LTI's HPV patent rights "in the hands of the Pasteur. If we [Beckman] could get this document [the CLA] signed, everything else would flow from that." (Tr. at 121:3–22, 222:2–223:17.)

32. Despite any concerns Mr. Grant may have had about the ambiguities or confusion contained in the CLA, Mr. Wareham signed the CLA on behalf of Beckman in his capacity as Vice President of the company. (DX 142 at 13; Tr. at 109:21–23; 114:6–8.)

### F. Digene's Conduct With Respect to Beckman's Status Under the CLA

33. Digene purchased LTI's entire right, title and interest to the CLA pursuant to an Agreement of Purchase and Sale of Assets, dated December 19, 1990 (*see supra* at ¶ 5).

34. Evan Jones joined Digene in July 1990 as President and Chief Executive Officer and is the current CEO of the company. (Tr. at 473:8–18.) Donna Marie Seyfried has been the Vice President of Business Development at Digene since 1996 and testified as a Rule 30(b)(6) witness on behalf of the company. (Tr. at 474:2–5; DX 285.)

35. In December 1991, Mr. Jones wrote two letters to Oncor, Inc. ("Oncor") expressing Digene's belief that certain of Oncor's probes pertaining to HPV 35 infringed the '332 patent. (DX 100; Tr. at 417:10–14.)

36. In 1992, Oncor, Ventana's predecessor in interest, entered into a Manufacturing Agreement with Beckman, in which Beckman granted Oncor the right to manufacture and sell HPV 35 probes. (D.I. 172 at 4; DX 30; PX 105.)

37. In January 1992, Oncor informed Digene that it believed it had a valid license to sell HPV 35. (DX 131; Tr. at 421:7–422:19.)

38. While continuing his correspondence with Oncor, Mr. Jones wrote to IP to gather more information about the CLA. (*See* DX 101, DX 118, DX 137.) In his letters to IP, Mr. Jones repeatedly characterized the CLA as "the Institut Pasteur/Digene/Beckman Cross-license Agreement." (*Id.*; Tr. at 482:14–24, 430:7–22, 483:22–484:7.)

39. Mr. Jones also stated in his letters to IP that the '332 patent is "cross-licensed between Institut Pasteur, Digene, Beckman and Toray Industries." (DX 101; Tr. at 425:14–22, 479:8–13.)

---

9. For example, Mr. Grant testified that, due to "an oversight" on the part of the CLA's draftsman, wherever the words "both parties" are recited in the CLA, it should be read as "all parties"; wherever the CLA says "either party" it should be read as "all parties"; and wherever the CLA says "each other" it should be read as "everybody". (Tr. at 222:17–223:7.)

40. On April 27, 1993, Digene sent DP a letter referencing "Digene's HPV 35 patent which is cross-licensed between Digene, Diagnostics Pasteur and Beckman Instruments." (DX 89; Tr. at 435:21–22, 487:8–19.)

41. Mr. Jones testified that he referenced all of these companies "because they had relationships around HPV" and that "it was meant as a business reference, not as a legal one." (Tr. at 480:17–21.)

42. Apparently prompted by Mr. Jones' inquiries about the CLA on behalf of Digene (see supra at ¶ 37), on June 20, 1996, IP's General Counsel, Alain Gallochat, sent a letter to Mr. Grant, stating that "[y]ou will undoubtedly recognize that Beckman was not party to the cross-license agreement which was made by and between LTI and Institut Pasteur and has only received non-exclusive license rights under the license agreements. . . ." [10] (DX 30.)

43. A few years after Mr. Gallochat's letter, Digene communicated with Beckman concerning the CLA. After consulting with and obtaining approval from Mr. Jones, Digene's trial counsel, and Digene's outside counsel, Ms. Seyfried sent Beckman a letter on November 15, 1999, stating that "Digene strongly believes that the 1992 Manufacturing Agreement [between Beckman and Oncor] constitutes an improper sublicense which is violative of both the April 1991 [11] LTI–Institut Pasteur Cross–License Agreement—to which Beckman is a signatory—and the June 7, 1991 IP–Beckman Agreement." (DX 126; Tr. at 457:7–10, 458:10–13, 510:14–21, 517:9–12.)

### G. Digene's Attempts to Purchase Beckman's License Rights

44. In the late 1990s, prior to Ms. Seyfried's letter to Beckman, Digene attempted to purchase Beckman's license rights in the HPV field. (Tr. at 445:4–12, 498:14–24.) As part of this proposed purchase, on August 26, 1998, Mr. Jones sent Mr. Grant a draft License Agreement. (DX 105; Tr. 156:14–16, 450:11–451:3, 452:14–21, 501:8–14.)

45. In Section 6.2(c) of the draft License Agreement, Digene sought a representation and warranty from Beckman that "with the exception of the Cross–License Agreement, the Beckman Assignment, and [the IP/Beckman Sublicense], there are no other contracts or agreements relating to the HPV Patent Rights, to which Beckman is a party." (DX 105 at 6.)

**10.** On January 9, 2004, Nicole Burle, currently IP's General Counsel, gave deposition testimony as a corporate representative of IP, pursuant to Federal Rule of Civil Procedure 30(b)(6). (Tr. of Burle Deposition ("Burle Dep.") at 13:13–15.) During her deposition, Ms. Burle referred to a position letter prepared by a French law firm at IP's request which expressed the opinion that Beckman was not a party to the CLA. (See PX 201.) At trial, the Defendants objected to Digene's motion to admit the Burle deposition designations and PX 201 into evidence, and I reserved decision on those objections. (Tr. at 544:24–555:10.) The Defendants' objections are sustained. Ms. Burle testified that, even though her name appears on the letter contained in PX 201, someone else prepared it and signed it on her behalf. (Tr. of Burle Dep. at 97:5–16.) Furthermore, Ms. Burle testified that, though she was employed at DP in 1990, she had no personal, first-hand knowledge about the negotiations surrounding the CLA. (Tr. of Burle Dep. at 27:8–17, 28:12–24.) Thus, her testimony is also hearsay and inadmissible due to a lack of personal knowledge regarding the CLA. PX201 lacks the requisite foundation for admission in evidence.

**11.** The year 1991 is a typographical error. The "April 1991 LTI–Institut Pasteur Cross–License Agreement" refers to the 1990 CLA. (Tr. at 457:22–458:3, 512:10–20.)

46. In a later draft of the License Agreement that Digene sent to Beckman on June 25, 1999, Digene sought a representation and warranty from Beckman that "...there are no other contracts or agreements relating to the HPV Patent Rights, to which Beckman is a party or by which it is bound." (DX 96 at 7.)

### H. Digene's Pleadings

47. On October 18, 2002, Digene filed a motion in this action for leave to file an amended complaint. (D.I.93.) In Digene's brief in support of that motion, it stated that "Beckman is a signatory to the Cross License and accepted its terms and conditions" and that certain of Beckman's activities *vis à vis* Oncor violated the terms of the CLA. (D.I. 94 at 3, 8–10.)

48. On December 13, 2002, Digene filed its First Amended Complaint in this action. (D.I.119.) Therein, Digene averred, *inter alia,* that "Beckman signed and accepted the terms and conditions of the April 1, 1990 Cross License Agreement between LTI (now Digene) and IP." (D.I. 119, ¶¶ 62 and 67.)

49. Beckman and Ventana filed their respective Motions to Compel Arbitration of Digene's claims against them on December 27, 2002. (D.I. 125, 128.)

50. Then, on January 28, 2003, Digene filed a motion for leave to file a second amended complaint, which deleted any reference or suggestion that Beckman was a party to the CLA. (D.I.139.)

51. On March 5, 2003, during a hearing regarding its second amended complaint the Defendants' Motions to Compel Arbitration, Digene asserted that, after conducting a further investigation, its allegations that Beckman signed, accepted, and, subsequently, materially breached the terms of the and conditions of the CLA were wrong. (D.I. 162 at 45:14, 46:6–9.)

### I. The Asset Purchase and Sale Agreement Between Ventana and Beckman

52. On September 23, 2002, Ventana and Beckman executed an Asset Purchase and Sale Agreement (the "2002 APA"), which provided that Ventana would purchase Beckman's entire right, title and interest in certain assets, including rights under the 1991 IP/Beckman Sublicense between IP and Beckman. (DX 265.) Beckman asserted that it decided to sell the IP/Beckman Sublicense rights to Ventana because Beckman was never able to make a success of the HPV business. (Tr. at 138:17–23.)

53. The 2002 APA between Beckman and Ventana states that it is to be "construed, interpreted and enforced according to the laws of the State of Arizona." (DX 265 ¶ 11.6.)

54. At trial, the parties agreed that any rights Ventana has to arbitration could only be derived from Beckman's rights under the CLA and not under the 1991 IP/Beckman Sublicense. (Tr. at 11:6–24, 271:11–275:15.)

55. According to Ventana's in-house counsel, Ventana was aware of the CLA years before entering into the 2002 APA with Beckman. (Tr. at 373:19–23.)

56. Beckman and Ventana never discussed the CLA and Ventana did not receive a copy of the CLA during negotiations regarding the 2002 APA. (Tr. at 285:15–21, 372:1–5.)

57. Beckman and Ventana executed a formal Assignment as part of the 2002 APA, which specifically transferred the right, title and interest in the 1991 IP/Beckman Sublicense from Beckman to Ventana. (PX 2; Tr. at 289:10–290:6.) Specifically, Paragraph 1 of the 2002 APA provides that Beckman only transferred

the assets set forth in Schedule 1.1 to Ventana. (Tr. at 347:8–348:10, 371:22–24.) Schedule 1.1 only lists "That certain Agreement effective June 7, 1991 by and between Institut Pasteur and Beckman Instruments, Inc.," that being the 1991 IP/Beckman Sublicense, and does not list the CLA. (*Id.*)

58. Furthermore, Paragraph 5.7 of the 2002 APA provides that "[s]et forth in Schedule 5.7 is a complete list of all material documents to which [Beckman] is a party related to the Business." (DX 265; Tr. at 149:12–24, 151:24–152:6.) Schedule 5.7 lists the 1991 IP/Beckman Sublicense, but it does not list the CLA. (Tr. at 282:20–282:18, 349:8–13.)

## III. CONCLUSIONS OF LAW

59. To the extent that any of my findings of fact may be considered conclusions of law, such findings are incorporated herein.

60. The CLA provides that it "shall be governed by and construed in accordance with the laws of the State of New York," (DX 142, ¶ 10) and, therefore, whether Beckman and Ventana have a right to arbitrate under the CLA is governed by New York law. *See, e.g., First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (when determining whether parties have agreed to arbitrate, state contract principles apply).

61. Generally, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration...." *Moses H. Cone Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Beckman and Ventana must prove they have a right to arbitrate under the CLA's arbitration clause.

*See, e.g., Dougherty v. Mieczkowski,* 661 F.Supp. 267, 272 (D.Del.1987) (to compel arbitration, movant needs to establish the existence of an agreement to arbitrate, arbitrable claims, and no waiver of the right to arbitration). However, "when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate has been made between the parties, [the court] should give to the opposing party the benefit of all reasonable doubts and inference that may arise." *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.,* 636 F.2d 51, 54 (3d Cir.1980) (footnote omitted).

62. With these principles in mind, I conclude that Beckman has sustained its burden of proving that it has a right to arbitrate Digene's claims against it, but that Ventana has not met its burden.

63. New York law has long held that a signatory may be bound by, and thus a party to, a contract, even though the signatory is not named as a party in the body of the contract. *See Medical & Health Employees v. Klein,* 218 A.D.2d 788, 789, 631 N.Y.S.2d 176 (2d Dep't 1995) ("As signatories to the agreement, all of the parties ... are bound by the mandatory arbitration clause contained in the agreement."); *Schonberger v. Culbertson,* 231 A.D. 257, 247 N.Y.S. 180, 181–82 (1st Dep't 1931). In this case, Beckman's Vice President signed the CLA on behalf of the company, and Beckman is specifically mentioned in Paragraph 1 of the CLA (*see supra* at ¶¶ 19, 22), as being one of two parties who may receive a sublicense from IP. Furthermore, Paragraph 1 specifically states that Beckman's signature on the CLA means that it accepts the terms and conditions of the CLA (*see supra* at ¶ 19). These facts weigh in favor of the conclusion that Beckman is a party to, and there-

fore bound by, to the CLA.[12]

64. This conclusion is heavily bolstered by Digene's own judicial admissions in its First Amended Complaint that Beckman signed, accepted, and then, materially breached, the terms and conditions to the CLA (*see supra* at ¶¶ 48, 51). Apparently, at the time it filed that pleading, Digene thought that Beckman was bound by the terms and conditions of the CLA. Even though Digene was granted leave to file a Second Amended Complaint in which it retreated from that position, the fact that Digene made such admissions in the first place is pertinent evidence of the effect of Beckman's signature on the CLA. *See Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir.1989) (holding a party to its assertions in an earlier pleading); *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir.1984) (holding that pleadings withdrawn are admissions against the pleader in the action in which they were filed). Digene cannot simply characterize its earlier pleadings, wherein it essentially treated Beckman as a party to the CLA, as a mistake (*see supra* at ¶ 51) in order to avoid arbitration.

65. More significantly, the parties' course of conduct subsequent to the execution of the CLA (but prior to Digene filing its pleadings) is further evidence of the parties' intent as to whether Beckman was a party to the CLA. *See Federal Ins. Co. v. Americas Ins. Co.*, 258 A.D.2d 39, 691 N.Y.S.2d 508, 512 (1st Dep't 1999) ("the parties' course of performance under the contract is considered to be the most per-

suasive evidence of the agreed intention of the parties...") (citations omitted); *see also Myers v. City of Schenectady*, 244 A.D.2d 845, 665 N.Y.S.2d 716, 718 (3d Dep't 1997) ("[t]here is no surer way to find out what the parties meant, than to see what they have done") (citations omitted).

66. Mr. Jones's letters to Oncor, DP, and IP repeatedly characterized the CLA as between IP, LTI, and Beckman, and expressed Digene's belief that the '332 patent was cross-licensed between those parties (*see supra* at ¶¶ 38–40). Though Mr. Jones claims that he was making a business, as opposed to legal, reference when he stated that the CLA was between IP, LTI, and Beckman (*see supra* at ¶ 41), such a distinction is immaterial. Mr. Jones's statements, made on behalf of Digene, are still persuasive evidence that Digene believed Beckman possessed a set of rights under the CLA.

67. Even though IP expressed the opinion that Beckman was not a party to the CLA in a 1996 letter from Mr. Gallochat to Mr. Grant (*see supra* at ¶ 42), Digene, while negotiating with Beckman and drafting License Agreements in its attempts to purchase Beckman's license rights in the HPV field in 1998, maintained the position that Beckman was a party to the CLA (*see supra* at ¶ 43).

68. Upon the advice of counsel, Digene sent a letter to Beckman in 1999 expressing its strong belief that Beckman's Manufacturing Agreement with Oncor violated the terms of the CLA (*see id.*). This

---

**12.** Mr. Grant testified at length and not entirely credibly about whether or not Beckman intended to be a party to the CLA, including his interpretation of the March 30, 1990 letter from Mr. Lesire, his understanding of the words "approve" and "accept," and whether he recommended that Beckman become a party to the CLA to Beckman's senior management (*see infra* at ¶¶ 29, 30). Mr. Grant's testimony on these issues, unpersuasive as it was at times, does not have any impact on my conclusion that Beckman is a party to the CLA. There is ample evidence in the record, apart from Mr. Grant's testimony, upon which to conclude that Beckman became a party to the CLA and acquired the right to arbitrate under the CLA.

evidence further indicates that Digene considered Beckman to be a party to the CLA, for if Beckman were not a party to the CLA, then Beckman would be incapable of violating it.

69. The CLA contains a broad arbitration provision (*see supra* at ¶ 20) "which creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that it covers the asserted dispute." *Oldroyd v. Elmira Savings Bank, FSB,* 134 F.3d 72, 76 (2d Cir.1998) (citations omitted). Because the CLA's arbitration clause is broadly worded—it refers only to "the parties" (*see id.*)—it applies to all parties to the CLA. *See, e.g., Progressive Casualty Insurance Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 48 (2d Cir.1993) (arbitration clause "between the contracting parties" is broadly applicable).

■ 70. Furthermore, the claims that Digene has asserted against Beckman are within the scope of the CLA's arbitration clause. *See Medtronic Ave. Inc. v. Advanced Cardiovascular Sys., Inc.,* 247 F.3d 44, 54 (3d Cir.2001). In determining whether a claim falls within the scope of an arbitration agreement, the "focus is on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." *Id.* at 55 (citation omitted).

■ 71. In its Second Amended Complaint, Digene accuses Beckman of contributory infringement or inducement of infringement of the '332 patent (Count II), tortious interference with business relations with regard to the '332 patent (Count III), and civil conspiracy for conspiring with Ventana to infringe or induce others to infringe the '332 patent (Count IV). (D.I. 174 at 14–15.)

72. All of these claims arise out of conduct associated with Digene's rights under the '332 patent. The factual underpinnings of Digene's claims necessarily implicate the CLA and its arbitration provisions, because Digene acquired its rights to the '332 patent from its predecessor in interest, LTI (*see supra* at ¶ 5). Because both Digene and Beckman are parties to the CLA, either one is entitled to invoke its broad arbitration provision.

73. For these reasons, I conclude that Beckman may arbitrate Digene's claims against it that implicate Beckman's rights under the CLA; that is, Beckman's rights to receive a sublicense from IP to develop, make and have made, use, sell market and otherwise commercially exploit products and services pertaining to HPV types 31, 35, 43 and 56 (*see supra* at ¶ 19).

■ 74. Ventana, on the other hand, has not demonstrated that it is entitled to arbitration (*see supra* at ¶ 62). The evidence adduced by Ventana at trial was insufficient for me to conclude that Ventana acquired any assets under the CLA due to its purchase of Beckman's assets in 2002. It therefore follows that Ventana does not have an arbitration right under the CLA.

75. However, as a matter of judicial economy and to prevent this case from moving forward on two tracks simultaneously, I will stay the proceedings against Ventana, pursuant to 9 U.S.C. § 3, pending the outcome of the arbitration between Digene and Beckman, as it is likely that information presented and conclusions reached at the arbitration regarding Digene's claims against Beckman will also be relevant to Digene's patent infringement claims against Ventana.

76. The 2002 APA is governed by the laws of the State of Arizona (*see supra* at ¶ 53). Under Arizona's law pertaining to contract interpretation, a court must inter-

**186**

pret a contract to effectuate the intent of the parties. *See, e.g., Johnson v. Hispanic Broadcasters of Tucson, Inc.,* 196 Ariz. 597, 2 P.3d 687, 689 (2000). Furthermore, to incorporate a document by reference, "the incorporating instrument must clearly evidence an intent that the writing be made part of the contract," *see United Cal. Bank v. Prudential Ins. Co.,* 140 Ariz. 238, 681 P.2d 390, 410.

77. It is undisputed that the CLA governs arbitrability in this case (*see supra* at ¶ 54), but Beckman never discussed the CLA with Ventana or formally transferred the CLA to Ventana during the 2002 APA, despite the fact that Ventana was aware of the CLA for years prior to the 2002 APA (*see supra* at ¶ 55).

78. I find that there is no intent to incorporate the CLA found in the language of the 2002 APA because the APA does not reference the CLA on its face or in its schedules (*see supra* at ¶ 58).

79. For all of these reasons, I find that the evidence does not support a conclusion that Ventana acquired any assets under the CLA as a result of the 2002 APA, nor does it support a conclusion that Ventana has an arbitration right under the CLA. However, the proceedings against Ventana will be stayed pending the outcome of the arbitration between Beckman and Digene.

### ORDER

In accordance with the Post–Trial Findings of Fact and Conclusions of Law issued today, it is hereby ORDERED, pursuant to 9 U.S.C. § 2, that Digene Corporation ("Digene") and Beckman Coulter Inc. ("Beckman") shall arbitrate Digene's claims against Beckman that arise out of Beckman's rights under the CLA. It is further ORDERED that this case is stayed, pursuant to 9 U.S.C. § 3, pending the outcome of the arbitration between Digene and Beckman.