MESO SCALE DIAGNOSTICS, LLC,
Meso Scale Technologies, LLC,
Plaintiffs,

v.

ROCHE DIAGNOSTICS GMBH., Roche Diagnostics Corp., Roche Holding Ltd., Igen International, Inc., Igen LS LLC, Lilli Acquisition Corp., Bioveris Corp., Defendants.

C.A. No. 5589–VCP.

Court of Chancery of Delaware.

Submitted: Nov. 5, 2012.
Decided: Feb. 22, 2013.
Revised: March 8, 2013.

Collins J. Seitz, Jr., Esq., David E. Ross, Esq., Seitz Ross Aronstam & Moritz LLP, Wilmington, Delaware; Mark C. Hansen, Esq., Michael J. Guzman, Esq., Gregory G. Rapawy, Esq., Joseph S. Hall, Esq., Christopher C. Funk, Esq., Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C, Washington, D.C.; Attorneys for Plaintiffs.

Andre G. Bouchard, Esq., Jamie L. Brown, Esq., Bouchard Margules & Friedlander P.A., Wilmington, Delaware; Nancy J. Sennett, Esq., Paul Bargren, Esq., Brett H. Ludwig, Esq., Eric L. Maassen, Esq., Foley & Lardner LLP, Milwaukee, Wisconsin; Attorneys for Defendants.

## OPINION

PARSONS, Vice Chancellor.

This action is before me on a motion for summary judgment relating to, among other things, license rights to sophisticated diagnostic and assay technology. In 2003, a foreign pharmaceutical and diagnostic holding company lost or was in danger of losing its exclusive license to that technology. The holding company sought to acquire a new license from the then-patent holder. In 2003, the holding company entered into a series of contemporaneously executed agreements that granted it a new non-exclusive license from the patent holder. The plaintiffs, two Delaware limited liability companies with disputed springing rights to the same patented technology, consented to the second nonexclusive license. As part of that transaction, the holding company acquired the patent holder, but not before the intellectual property assets were transferred to a separate company. In 2007, the holding company acquired that separate company through a reverse triangular merger.

In 2010, the plaintiffs filed the complaint in this action asserting that the foreign holding company and a number of their affiliates breached two agreements related to the 2003 transaction. In the first count, the plaintiffs claim that the 2007 reverse triangular merger was an assignment by operation of law that required their consent. The plaintiffs' second count asserts that the defendants breached the new 2003 license by selling products and services based on the technology outside the licensed field of use.

The defendants have moved for summary judgment on multiple grounds. As a preliminary matter, the defendants contend that the first count is time-barred by the doctrine of laches. The defendants also seek summary judgment on the first count on the grounds that: (1) the anti-assignment clause in a global consent signed by the plaintiffs was intended to govern only the assignment of rights contained in that global consent and (2) a reverse triangular merger cannot be an

assignment by operation of law. In seeking summary judgment on the second count, the defendants contend that the plaintiffs were not parties to the license agreement with the right to enforce the provisions of that agreement. In that regard, the defendants argue that the contract in question is unambiguous and that there is no triable issue of material fact relating to its meaning. Having considered the parties' extensive briefing and arguments and the voluminous record before me at this stage, I grant summary judgment on the first count on the basis that the reverse triangular merger was not an assignment by operation of law or otherwise, such that it would have required the plaintiffs' consent. I deny, however, the defendants' motion for summary judgment on the second count because the license agreement is ambiguous, the defendants failed to prove that New York law conclusively bars the plaintiffs' claim, and the plaintiffs have raised triable issues of material fact.

## I. BACKGROUND

### A. The Parties

Plaintiffs Meso Scale Diagnostics, LLC ("MSD") and Meso Scale Technologies, LLC ("MST" and, collectively, "Plaintiffs" or "Meso") are Delaware limited liability companies. MST was founded by Jacob Wohlstadter to commercialize his invention of a new application of electrochemiluminescent ("ECL") technology. In 1995, MST and IGEN International, Inc. ("IGEN") formed MSD as a joint venture.[1] The joint venture was created to research and develop the use of various technologies in diagnostic procedures, including procedures utilizing ECL technology.[2] Jacob Wohlstadter is the President and Chief Executive Officer ("CEO") of MSD and MST.

The defendants in this case are all affiliates or subsidiaries of the F. Hoffmann–La Roche, Ltd. family of pharmaceutical and diagnostics companies. Roche Holding Ltd. ("Roche Holding") is a publicly traded joint stock company organized under the laws of Switzerland.[3] Roche Diagnostics GmbH is a limited liability company organized under the laws of Germany and a wholly owned subsidiary of Roche Holding.[4] Defendant Roche Diagnostics Corp., which is incorporated in Indiana, is also a wholly owned subsidiary of Roche Holding.[5] IGEN is a Delaware corporation that was acquired by Roche Holding in 2003 and remains a wholly owned subsidiary of Roche Holding.[6] IGEN LS, LLC ("IGEN LS") is a Delaware limited liability company and wholly owned subsidiary of IGEN.[7] BioVeris Corp. ("BioVeris") is a Delaware corporation and wholly owned subsidiary of Roche Holding.[8] BioVeris owns and licenses a portfolio of patents based on and related to ECL technology.[9] Lili Acquisition Corp. ("Lili Acquisition") was a subsidiary of Roche Holding that was merged into BioVeris on June 26, 2007

---

1. *See* Transmittal Aff. of Jamie L. Brown ("Brown Aff") Ex. 5.

2. *See id.* at 00036568.

3. Decl. of Claus–Joerg Ruetsch in Supp. of Defs.' Mot. for Summ. J. ("Ruetsch Decl.") ¶ 2.

4. *Id.* ¶ 3.

5. *Id.* ¶ 4.

6. *Id.* ¶ 5.

7. *Id.* ¶ 6.

8. *Id.* ¶ 7.

9. Ruetsch Decl. ¶ 8.

and no longer exists.[10] The following diagram depicts the relationships of the defendants (collectively "Defendants" or "Roche"):

### B. Facts[11]

#### 1. The 1992 License

In 1992, IGEN granted Boehring Mannheim GmbH ("BMG"), a company acquired by Roche in 1998, a license (the "1992 License") to use its patented ECL technology.[12] The 1992 License was narrow in scope and only allowed BMG to use the licensed technology in hospitals, blood banks, and clinical reference laboratories.[13] The license explicitly excluded use of the technology in the proximity of a patient, such as home, patient bedside, ambulance, and physician office uses.[14]

#### 2. The MSD License

MSD was formed in 1995 as a joint venture between IGEN and MST, and was intended to be the exclusive vehicle for developing and commercializing the use of various technologies in diagnostic procedures, including procedures utilizing ECL technology.[15] IGEN also "granted to MSD an exclusive, worldwide, royalty-free license [*i.e.*, the "MSD License"] to practice the IGEN Technology to make, use and sell products or processes (A) developed in the course of the Research Program, or (B) utilizing or related to the Research Technologies."[16] Those technologies included "selection and screening methods," "electrodes," and "multi-array diagnostic[s]."[17] The MSD License has a perpetual term and provides that it will survive a termination of the MSD joint venture for any reason.[18] The MSD License also contains a now-disputed springing right under which, if an exclusive license previously granted to a third party, such as the exclusive rights granted to Roche under the 1992 License, was termi-

10. *Id.* ¶ 9.

11. Unless otherwise noted, the facts set forth in this Opinion are undisputed and taken from the verified pleadings, admissions, affidavits, depositions, and other evidence submitted to the Court.

12. Brown Aff. Ex. 9.

13. *Id.* §§ 1.4, 4.1–4.2.

14. *Id.* § 1.4.

15. Brown Aff. Ex. 5 at 00036568, § 4.1.

16. Transmittal Aff. of David E. Ross in Supp. of Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Ross Aff.") Ex. 3 § 2.1.

17. Brown Aff. Ex. 5 § 1.11.

18. *Id.* § 6.1.

nated or IGEN was no longer restricted by such a license from licensing to MSD, the technology automatically would be licensed to MSD.[19] Finally, IGEN agreed, as part of the MSD joint venture agreement (the "Joint Venture Agreement") and for the term of that agreement, that it would not use or allow its technology to be used to compete with MSD with respect to the Research Program.[20]

### 3. The Fourth Circuit litigation

In 1997, IGEN brought suit against Roche for breach of contract for, among other things, failing to pay royalties, failing to share ECL improvements with IGEN, and selling ECL-based products outside the contractually limited field.[21] While the suit was ongoing, Roche allegedly sought to settle with IGEN by acquiring ownership or access to the ECL rights.[22] In 2001, Roche made a public tender offer to acquire IGEN for $1.5 billion.[23] After conducting due diligence, however, Roche became concerned that acquiring IGEN "would *not* achieve the stated objectives of unencumbered ownership, avoidance of future litigation and discontinuation of business relationships with business entities

controlled by the Wohlstadter family." [24] Roche ultimately informed IGEN that it could not pursue an acquisition at that time.[25] During later settlement negotiations in 2002, Roche sought to have MSD and MST "consent to and join in the license granted to Roche as necessary to [e]nsure Roche's non-exclusive use of the ECL Technology in Roche's Field." [26]

While negotiations were still ongoing, the jury returned a special verdict in IGEN's favor finding that Roche had materially breached the 1992 Agreement and awarding compensatory and punitive damages against it.[27] As a result, the United States District Court for the District of Maryland then allowed IGEN to terminate the 1992 License; the United States Court of Appeals for the Fourth Circuit affirmed that decision on July 9, 2003.[28] That same day, IGEN sent Roche a notice purporting to terminate the 1992 License.[29] As a result of the termination of the 1992 License and MSD's springing rights in the MSD License, those rights, according to MSD, were automatically and exclusively licensed to MSD.[30] In other words, Plaintiffs appear to contend that the ECL rights IGEN previously had licensed to

19. Ross Aff. Ex. 3 § 2.1 ("In the event any such exclusive license terminates, or IGEN is otherwise no longer restricted by such license from licensing such technology to MSD, such technology shall be, and hereby is, licensed to MSD pursuant hereto."). The scope and exclusive nature of MSD's rights under Section 2.1 of the MSD License is disputed by Roche. Because the record was not fully developed on this question, I assume for purposes of Roche's summary judgment motion that any license granted pursuant to Section 2.1 is exclusive.

20. Brown Aff. Ex. 5 § 4.1.

21. *See IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 308 (4th Cir.2003).

22. Ross Aff. Ex. 9 at 771 (Keller), 961 (Ruetsch).

23. *Id.* Ex. 11 at 0036626.

24. *Id.*

25. *Id.*

26. Ross Aff. Ex. 16.

27. *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d at 308.

28. *Id.* at 315.

29. Ross Aff. Ex. 40 at 007352324, Ex. 41.

30. *See id.* Ex. 3 § 2.1 ("In the event any such exclusive license terminates . . . such technology shall be, and hereby is, licensed to MSD pursuant hereto.").

Roche were now exclusively licensed to MSD.[31]

### 4. The 2003 Transaction

Roche had expressed concern over the possible termination of the 1992 License in its 10–K for the fiscal year ended March 31, 2003, stating that in the event the 1992 License was terminated, its business would be materially adversely affected.[32] Not surprisingly, therefore, just two weeks after the appellate ruling, Roche sought to reacquire ECL licensing rights so as to preserve its immunoassay business, which relied on ECL technology. Ultimately, Roche agreed to purchase IGEN for $1.25 billion and, along with IGEN, MSD, and MST, entered into a transaction (the "2003 Transaction"), which was memorialized in a number of contemporaneous agreements (the "Transaction Agreements.").[33]

As part of the 2003 Transaction, IGEN provided a license (the "Roche License" or "License") to IGEN LS, a newly formed and wholly owned subsidiary of IGEN.[34]

Under the Restructuring Agreement, IGEN's operating business and intellectual property rights (including IGEN's ECL intellectual property) were spun off to IGEN Integrated Healthcare, LLC, *i.e.* "Newco," which eventually became BioVeris.[35] IGEN LS retained its rights as a licensee under the Roche License.

---

31. *Id.* Ex. 21 at 281.

32. Brown Aff. Ex. 12 at 0019211–12.

33. *See* Ross Aff. Ex. 28. The "Transaction Agreements" are comprised of: (1) the Global Consent; (2) the Merger Agreement; (3) the Restructuring Agreement; (4) the Post–Closing Covenants Agreement; (5) the Tax Allocation Agreement; (6) the Ongoing Litigation Agreement; (7) the Release Agreement; (8) the License Agreement; (9) the Improvements License Agreement; (10) the Covenants Not to Sue; (11) the PCR [Polymerase Chain Reaction] License Agreement; and (12) the PCR Services Agreement.

34. *See id.* Ex. 29.

35. Brown Aff. Ex. 14.

Under the Merger Agreement, 66 Acquisition Corporation II ("Sub"), a wholly owned subsidiary of Roche Holding, then was merged with and into IGEN.[36]

Finally, Newco changed its name to BioVeris Corporation and became a publicly held and publicly traded company.[37] As a result of the 2003 Transaction, which was signed on July 24, 2003, BioVeris obtained IGEN's intellectual property rights and Roche obtained a limited-field license indirectly through IGEN LS.

36. *Id.* Ex. 13.

37. *Id.* Ex. 14 § 2.01.

The details of the relevant Transaction Agreements are summarized below.

### a. The Roche License

Under the Roche License, IGEN granted IGEN LS "only for use in the Field, an irrevocable, perpetual, Non–Exclusive, worldwide, fully-paid, royalty-free right and license under the Licensed ECL Technology, to develop, ... use, ... sell, ... and otherwise commercially exploit Products."[38] "Products" is defined as "ECL instruments, service for ECL instruments and spare parts; and ECL Assays."[39] The Roche License defines "Field" as "the analyzing of specimens taken from a human body, including without limitation, blood, bodily fluid or tissue, for the purpose of testing, with respect to that human being, for a physiological or pathological state, a congenital abnormality, safety and compatibility of a treatment or to monitor therapeutic measures."[40] The Field explicitly excluded

analyzing for (A) life science research and/or development, including at any pharmaceutical company or biotechnology company, (B) patient self testing use; (C) drug discovery and/or drug development ... including clinical research or determinations in or for clinical trials or in the regulatory approval process for a drug or therapy, or (D) veterinary, food, water, or environmental testing or use.[41]

The Roche License was "non-exclusive" and ultimately permitted BioVeris to "exercise the licensed rights itself in the licensee's field or grant non-exclusive licenses in the licensee's field to a third party, or retain for itself any non-exclusive license rights."[42]

Section 2.5 of the Roche License provided an enforcement mechanism to ensure that Roche did not conduct out-of-field sales. Section 2.5(a) contemplated the appointment of a neutral third party to monitor Roche's compliance by examining such records as necessary. Section 2.5(b) also

---

38. Ross Aff. Ex. 29 § 2.1.

39. *Id.* § 1.13.

40. *Id.* § 1.7(a).

41. *Id.* § 1.7(b).

42. *Id.* § 1.10.

provided that if out-of-field sales occurred, Roche could continue to sell until BioVeris notified Roche it was prohibited, and BioVeris's exclusive remedy would be that Roche would have to pay to it 65% of all revenues earned from out-of-field sales. The Roche License also stated that if the parties to the agreement were unable to resolve a dispute through good faith negotiation, any dispute arising out of or relating to the agreement would be resolved solely by arbitration.[43]

The Roche License designates IGEN and IGEN LS as the "Parties" to the agreement.[44] BioVeris later succeeded to IGEN's rights and obligations. Moreover, the agreement expressly provided that, except for limited circumstances, "nothing [in the Roche License] is intended to confer upon any person other than the Parties hereto and their respective successors and permitted assigns, any benefit, right or remedy under or by reason of [the Roche License]."[45]

The signature pages of the Roche License, however, were followed by a document entitled "CONSENT BY MESO SCALE DIAGNOSTICS, LLC AND MESO SCALE TECHNOLOGIES, LLC" (the "Meso Consent").[46] The Meso Consent states that MSD and MST

> consent to the [Roche License] . . . and . . . consent to and *join in the licenses granted* to [Roche] in the [Roche License]. . . . Furthermore, MSD and

MST . . . represent and warrant to [Roche] that each of them . . . waive any right that either of them may have to in any way restrict or limit [Roche's] exercise of the licenses granted in the [Roche License] during the Term thereof.[47]

The Meso Consent was signed by MSD and MST.[48]

### b. The Global Consent

Jacob Wohlstadter participated in the negotiations between IGEN and Roche regarding the 2003 Transaction, although the parties dispute his role.[49] Defendants contend that Wohlstadter extracted $37.5 million for MSD's consent to the transfer of IGEN's interest in MSD to BioVeris.[50] On the other hand, Plaintiffs contend that "Roche made clear that it would not pay for a license or make a $1.4 billion payment unless Meso agreed to both consent to and join in" the Roche License.[51]

In addition to the Meso Consent, MSD and MST also signed the Global Consent. The latter document contained an important provision preventing the assignment of rights of Newco (ultimately, BioVeris) without the prior written consent of the other parties.[52] Specifically, Section 5.08 stated:

> Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in

---

43. Ross Aff. Ex. 29 §§ 6.1–6.2.

44. *Id.* at 1.

45. *Id.* § 14.11.

46. *Id.* at 0055887.

47. *Id.* (emphasis added).

48. *Id.*

49. *See* Brown Aff. Ex. 10 at 44–49.

50. Defs.' Br. in Supp. of Their Mot. for Summ. J. ("Defs.' Opening Br.") 7.

51. Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Answering Br.") 13 (citing Ross Aff. Ex. 10 at 123; Ex. 14 at 204–05, 233–34). Jacob Wohlstadter had an interest in IGEN for which he received approximately $10 million as a result of the 2003 Transaction. Brown Aff. Ex. 64 at 237 (Jacob Wohlstadter).

52. Ross Aff. Ex. 28 § 5.08.

whole or in part, *by operation of law or otherwise by any of the parties without the prior written consent of the other parties;* provided, however, that the parties acknowledge and agree that the conversion of Newco in accordance with Section 2.01 of the Restructuring Agreement and the continuation of Newco as a result thereof shall be deemed not to be an assignment and shall not require any consent of any party. Any purported assignment without such consent shall be void. Subject to the preceding sentences, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the parties and their respective successors and assigns.[53]

Importantly, the Global Consent stated that the Agreement was among Roche Holding, IGEN, IGEN Integrated Healthcare, LLC, MSD, MST, Jacob Wohlstadter, and JW Consulting Services, L.L.C. In another section of the Global Consent, MSD, MST, Jacob Wohlstadter, and JW Consulting Services, L.L.C. acknowledged receipt of the twelve Transaction Agreements, consented to the consummation of the transactions, and granted all waivers and consents necessary to permit the consummation of the transactions and the performance by the parties of their obligations under the Transaction Agreements.[54]

In Section 3.02 of the Global Consent, MSD and MST acknowledged and consented to the MSD Transfer, whereby "all of [IGEN]'s rights under and in respect of the MSD Agreements shall be assigned to, and all of the Company's liabilities under and in respect of the MSD Agreements will be assumed by[ ] Newco." [55] Notably, the MSD Agreements included both the Joint Venture Agreement and the MSD License. Meso also consented to and accepted "the assumption by Newco of all rights, obligations, duties and Liabilities (express and implied) of [IGEN] under the MSD Agreements." [56] Finally, MSD and MST acknowledged and consented that, as a result of the transfer, Newco would own "all right, title and interest in and to any and all intellectual property and other proprietary and confidential information or materials owned by [IGEN] ... to which MSD [or] MST ... has any direct or indirect rights or benefits ... pursuant to the MSD Agreements." [57]

### c. The Post–Closing Covenants Agreement

One of the Transaction Agreements, the Post–Closing Covenants Agreement, contained a provision that prevented Roche for four years from making a proposal to acquire or from acquiring any securities or assets of Newco (*i.e.*, BioVeris), although Newco independently could waive or amend that restriction.[58]

### 5. Roche's acquisition of BioVeris

After the 2003 Transaction was completed, BioVeris alleged that Roche was selling ECL-based products outside of the Field. Roche asserted that the out-of-field sales were minimal and estimated that it owed a $1.5 million fee to BioVeris under the 65% royalty provided for in Section 2.5(b) of the Roche License.[59] BioVeris, however, estimated that the fee due from Roche for out-of-field sales could exceed $30 million an-

---

53. *Id.* (emphasis added).

54. *Id.* § 3.01.

55. *Id.* § 3.02(a), (b).

56. *Id.* § 3.02(b).

57. *Id.* § 3.02(e).

58. Brown Aff. Ex. 21 § 3.10.

59. Ross Aff. Ex. 47 at 17.

nually.[60] The parties therefore engaged Ernst & Young LLP ("Ernst & Young") as a neutral "field monitor" to calculate out-of-field sales.[61]

According to Roche, Samuel Wohlstadter, the CEO of BioVeris, "repeatedly" proposed to Roche that it buy BioVeris to resolve the dispute over out-of-field sales.[62] Consistent with that suggestion, on July 20, 2006, Samuel Wohlstadter waived the four-year restriction in the Post–Closing Covenants Agreement and permitted Roche to discuss a consensual transaction with BioVeris.[63]

As an independent business, BioVeris was not very profitable. For example, in 2006, BioVeris had only $20.6 million in revenues and incurred a net loss of $27.9 million.[64] Nevertheless, in March 2007, Roche offered to pay approximately $600 million in cash for BioVeris, a 58% premium over its pre-announcement market capitalization of approximately $370 million.[65]

The record shows that Roche's sole objective was to acquire BioVeris's intellectual property rights.[66] Roche internally had valued those intellectual property rights at 1.695 billion Swiss francs, or approximately $1.4 billion.[67] Roche also touted the fact that "[b]y acquiring BioVeris, Roche [would] own the complete patent estate of the [ECL] technology deployed in [Roche's] Elecsys product line which gives Roche Diagnostics the opportunity to fully exploit the entire immunochemistry market." [68]

The acquisition of BioVeris (the "BioVeris Merger") was structured as a reverse triangular merger.[69] Lili Acquisition was formed as an "acquisition subsidiary" of Roche and merged into BioVeris on June 26, 2007, with BioVeris as the surviving corporation.[70] As a result of the merger, "all the properties, right, privileges, powers and franchises of [BioVeris] and [Lili Acquisition] [vested] in [BioVeris], and all claims, obligations, debts, liabilities and duties of [BioVeris] and [Lili Acquisition] [became] the claims, obligations, debts, liabilities and duties of [BioVeris]." [71]

In September 2007, BioVeris notified its customers that it was discontinuing certain product lines and that they would need to develop a plan to transition to another supplier or alternate technology.[72] In September and October 2007, Roche closed down BioVeris's research and development plant and delivered exit dates to each em-

60. *Id.*

61. *Id.*

62. Brown Aff. Ex. 70 at 56–57.

63. *Id.* Ex. 30.

64. Ross Aff. Ex. 52 at 42–43.

65. *Id.* Ex. 41 at 3, 4, 14 (27,247,902 outstanding shares; $13.60 pre-announcement share price; $21.50 per share merger consideration).

66. *See, e.g., id.* Ex. 44 at 44 (Humer) ("Q: Okay. Just again to my question, was BioVeris'[s] condition as an operating company irrelevant to your decision to buy BioVeris? A: BioVeris held certain patent rights and intellectual property which we wanted to acquire. Q: Did it matter to you what BioVeris'[s] operating business did as a matter of its financials? A: That was not relevant.").

67. *See id.* Ex. 55 at 0071130; X–Rates, Historical Rates, http://www.x-rates.com/historical/?from=USD&amount=1.00&date=2007-04-16.

68. *Id.* Ex. 59 at 0041325.

69. *Id.*

70. Brown Aff. Ex. 4 §§ 1.1, 1.4.

71. *Id.* § 1.4.

72. Ross Aff. Ex. 67.

ployee of BioVeris.[73] At all times after the BioVeris Merger, however, BioVeris continued to hold the intellectual property relevant to this dispute.[74]

### C. Procedural History

On June 22, 2010, Meso commenced this action by filing a complaint (the "Complaint") against Roche charging it with breach of contract as to (1) the Global Consent (Count I) and (2) the Roche License (Count II). Roche promptly moved to dismiss the claims against it for failure to state a claim. For its part, Meso sought to submit Count II to arbitration and to stay further proceedings on that count pending the arbitration panel's decision.

In a Memorandum Opinion dated April 8, 2011,[75] I denied Roche's motion to dismiss and referred the question of whether Count II was arbitrable to a New York arbitration panel (the "Arbitration Panel" or "Panel"). In April and May 2012, the Arbitration Panel heard testimony from eight witnesses over four days. On September 10, the Arbitration Panel concluded that Meso's claim for breach of the Roche License was not arbitrable and that each party should bear its own costs and expenses.

On September 2, 2012, Roche moved for summary judgment in this Court on both counts of the Complaint. After extensive briefing, I heard argument on November 5, 2012. At the argument, I confirmed the Panel's final award and lifted the stay as to Count II. A trial on the merits of both counts is scheduled to begin on February 25, 2013. This Opinion constitutes my ruling on Roche's motion for summary judgment.

### D. Parties' Contentions

Roche seeks summary judgment on several independent grounds. First, Roche avers that Count I is barred by the doctrine of laches because it was filed outside the analogous three-year statute of limitations period. Roche also seeks summary judgment on Count I on the bases that: (1) the Global Consent was not intended to govern the assignment of rights contained in the Roche License; and (2), as a matter of law, a reverse triangular merger cannot be an assignment by operation of law. In support of summary judgment on Count II, Roche argues that this Court is bound by the Arbitration Panel's finding that MSD and MST were not, and were not intended to be, parties to the Roche License. Moreover, Roche contends that the plain language of the Roche License and the Meso Consent unambiguously indicate that MSD and MST were not parties to the Roche License, and, therefore, have no standing to sue for breach of it. Finally, Roche argues that the extrinsic evidence conclusively shows that MSD and MST were not intended to be parties with the right to enforce the Roche License.

Meso disputes all of Roche's contentions and urges denial of Defendants' motion for summary judgment in its entirety. As a threshold matter, Meso contends that Count I accrued within the analogous three-year limitations period, and that, therefore, it is not barred by laches. Roche also argues that summary judgment on Count I is unwarranted because both the plain language of the Global Consent and the extrinsic evidence show that the parties intended the Global Consent to cover IGEN's intellectual property. In re-

---

73. *Id.* Ex. 68.

74. Tr. 71.

75. *Meso Scale Diagnostics, LLC v. Roche Diagnostics GMBH,* 2011 WL 1348438 (Del.Ch. Apr. 8, 2011).

gard to Count II, Meso denies that this Court is bound by the Arbitration Panel's determination. Finally, Meso asserts that the Roche License is ambiguous and that there are triable issues of material fact as to whether MSD and MST were parties to the Roche License or had rights to enforce it.

## II. ANALYSIS

"Summary judgment is granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [76] In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence are to be viewed in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that no material question of fact exists.[77] The party opposing summary judgment, however, may not rest upon the mere allegations or denials contained in its pleadings, but must offer, by affidavit or other admissible evidence, specific facts showing that there is a genuine issue for trial.[78]

In addition, summary judgment may be denied when the legal question presented needs to be assessed in the "more highly textured factual setting of a trial" [79] or when the Court "decides that a more thorough development of the record would clarify the law or its application." [80]

When an issue presented for summary judgment is one of contractual interpretation, "the role of a court is to effectuate the parties' intent," [81] taking the contract as a whole and "giving effect to each and every term." [82] If the language of the agreement is "clear and unambiguous," the reviewing court finds the parties' intent in the ordinary and usual meaning of the words they have chosen.[83] If, however, "the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity. Then the interpreting court must look beyond the language of the contract to ascertain the parties' inten-

76. *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *8 (Del.Ch. Sept. 14, 2007) (citing Ct. Ch. R. 56(c)).

77. *Walker L.L.P. v. Spira Footwear, Inc.*, 2008 WL 2487256, at *3 (Del.Ch. June 23, 2008) (citing *Senior Tour Players 207 Mgmt. Co. v. Golftown 207 Hldg. Co.*, 853 A.2d 124, 126 (Del.Ch.2004)).

78. Ct. Ch. R. 56(e); *Walker L.L.P.*, 2008 WL 2487256, at *3 (citing *Levy v. HLI Operating Co.*, 924 A.2d 210, 219 (Del.Ch.2007)).

79. *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1239 n. 3 (Del.Ch.1987) (citing *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948)).

80. *Tunnell v. Stokley*, 2006 WL 452780, at *2 (Del.Ch. Feb. 15, 2006) (quoting *Cooke v. Oolie*, 2000 WL 710199, at *11 (Del.Ch. May 24, 2000)).

81. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del.2006).

82. *Meso Scale Diagnostics, LLC v. Roche Diagnostics GMBH*, 2011 WL 1348438, at *8 (Del.Ch. Apr. 8, 2011); *see also GMC Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del.2012) ("The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan.").

83. *Lorillard Tobacco Co.*, 903 A.2d at 739 (quoting *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del.1992)); *W. Willow–Bay Court, LLC v. Robino–Bay Court Plaza, LLC*, 2007 WL 3317551, at *9 (Del.Ch. Nov. 2, 2007), *aff'd*, 985 A.2d 391 (Del.2009) (TABLE).

tions" [84] from extrinsic evidence, such as "overt statements and acts of the parties, the business context, prior dealings between the parties, and business custom and usage in the industry." [85] Determining intent from extrinsic evidence "may be accomplished by the summary judgment procedure in certain cases where the moving party's record is not *prima facie* rebutted so as to create issues of material fact." [86] Generally, on a motion for summary judgment, the moving party must show there is no genuine issue of material fact, and "summary judgment may not be awarded if the [disputed contract] language is ambiguous and the moving party has failed to offer uncontested evidence as to the proper interpretation." [87]

### A. Count I: Breach of Section 5.08 of the Global License

In Count I, Meso alleges that Roche breached Section 5.08 of the Global Consent by effecting an assignment of BioVeris's rights and obligations *by operation of law or otherwise* without the written consent of MSD and MST. Section 5.08 states in pertinent part:

> Neither this Agreement nor any of the rights, interests or obligations *under this Agreement* shall be assigned, in whole or in part, *by operation of law or otherwise* by any of the parties without the prior written consent of the other

parties; provided, however, that the parties acknowledge and agree that the conversion of [BioVeris] in accordance with Section 2.01 of the Restructuring Agreement and the continuation of [BioVeris] as a result thereof shall be deemed not to be an assignment and shall not require any consent of any party.... [88]

Defendants seek summary judgment in their favor on three grounds: (1) Count I is barred by the doctrine of laches; (2) BioVeris's rights, interests, or obligations relating to its intellectual property are not subject to Section 5.08; and (3) Roche's acquisition of BioVeris through a reverse triangular merger was not an assignment by operation of law. I address each of these points in turn.

### 1. Is Count I barred by the doctrine of laches?

Roche asserts that Count I is time-barred by Delaware's applicable three-year period of limitations. "[I]n a court of equity, the applicable defense for untimely commencement of an action for an equitable claim is laches, rather than the statute of limitations." [89] Laches "operates to prevent the enforcement of a claim in equity if the plaintiff delayed unreasonably in asserting the claim, thereby causing the defendants to change their position to their detriment." [90] This doc-

---

**84.** *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997) (footnotes omitted); *see also Hynansky v. Vietri,* 2003 WL 21976031, at *2 n. 14 (Del.Ch. Aug. 7, 2003) (citing *Eagle Indus.,* 702 A.2d at 1232) (considering extrinsic evidence on motion for summary judgment).

**85.** *Concord Steel, Inc. v. Wilm. Steel Processing Co.,* 2009 WL 3161643, at *6 (Del.Ch. Sept. 30, 2009) (internal quotation marks and footnote omitted), *aff'd,* 7 A.3d 486 (Del.2010) (TABLE).

**86.** *Eagle Indus.,* 702 A.2d at 1233.

**87.** *GMC Capital Invs., LLC,* 36 A.3d at 784.

**88.** Ross Aff. Ex. 28 § 5.08 (emphasis added).

**89.** *Winner Acceptance Corp. v. Return on Capital Corp.,* 2008 WL 5352063, at *13 (Del.Ch. Dec. 23, 2008); *see also Reid v. Spazio,* 970 A.2d 176, 182 (Del.2009) (citations omitted).

**90.** *Scureman v. Judge,* 626 A.2d 5, 13 (Del.Ch. 1992), *aff'd sub nom. Wilm. Trust Co. v. Judge,* 628 A.2d 85 (Del.1993).

trine "is rooted in the maxim that equity aids the vigilant, not those who slumber on their rights."[91] There are three generally accepted elements to the equitable defense of laches: "(1) plaintiff's knowledge that she has a basis for legal action; (2) plaintiff's unreasonable delay in bringing a lawsuit; and (3) identifiable prejudice suffered by the defendant as a result of the plaintiff's unreasonable delay."[92]

The Court of Chancery generally begins its laches analysis by applying the analogous legal statute of limitations.[93] The time fixed by the statute of limitations is deemed to create a presumptive time period for purposes of the Court's application of laches absent circumstances that would make the imposition of the statutory time bar unjust.[94] In this case, the analogous statute of limitations for a claim of breach of contract is three years "from the accruing of the cause of such action."[95]

Under Count I, Meso alleges that Roche violated Section 5.08 of the Global Consent by assigning BioVeris's rights and obligations without the written consent of Meso.[96] In that regard, Defendants contend that Plaintiffs' cause of action accrued on April 4, 2007, when Roche Holding, Lili Acquisition, and BioVeris entered into a *binding* Agreement and Plan of Merger (the "BioVeris–Lili Merger Agreement"). Yet, Meso did not file their Complaint until June 22, 2010—over three years after April 4, 2007. Thus, according to Roche, Meso's claim is barred by laches. Meso disputes that conclusion, arguing that the cause of action did not accrue until all contingencies in the BioVeris–Lili Merger Agreement had been fulfilled, *i.e.*, on June 26, 2007, the date the merger closed.

"[A] cause of action 'accrues' under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of that cause of action."[97] "The 'wrongful act' is a general concept that varies depending on the nature of the claim at issue. For breach of contract claims, the wrongful act is the breach, and the cause of action accrues at the time of breach."[98] Breach is defined as a "[f]ailure, without legal excuse, to perform any promise which forms the whole or part of a contract."[99] To determine the accrual date, therefore, courts must examine the language of the contract.

Here, Section 5.08 of the Global Consent provides that "[n]either this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned, in whole or in part, by opera-

---

91. *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del.1982).

92. *See Tafeen v. Homestore, Inc.*, 2004 WL 556733, at *7 (Del.Ch. Mar. 22, 2004).

93. *See, e.g., Adams*, 452 A.2d at 157; *Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062, 1064 (Del.Ch.1989).

94. *See U.S. Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996); *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del.Ch.1993).

95. 10 *Del. C.* § 8106.

96. *See* Compl. ¶ 66.

97. *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del.2004).

98. *Whittington v. Dragon Gp. LLC*, 2008 WL 4419075, at *5 (Del.Ch. June 6, 2008) (citing *Certainteed Corp. v. Celotex Corp.*, 2005 WL 217032, at *7 (Del.Ch. Jan. 24, 2005)).

99. *See L.H. v. C.H.*, 2000 WL 33200939, at *1 (Del.Fam. Nov. 28, 2000) (citing Black's Law Dictionary 130 (6th ed.1991)); *see also* Black's Law Dictionary 200 (8th ed.2004) (defining "breach of contract" as a "[v]iolation of a contractual obligation by failing to perform one's own promise, by repudiating it, or by interfering with another party's performance").

tion of law or otherwise by any of the parties without the prior written consent of the other parties."[100] Because the BioVeris Merger did not close until June 26, 2007, the alleged assignment that forms the basis for the claimed breach did not occur until that date.[101] As a result, Roche's laches theory must rely on the BioVeris–Lili Merger Agreement entered into on April 4, 2007 amounting to an anticipatory breach or repudiation of the Global Consent.

■ "[R]epudiation is ... a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach."[102] Viewed in this light, Roche arguably effected a repudiation of the Global Consent on April 4, 2007, when it entered into a binding merger agreement obligating its board of directors to recommend to its stockholders approval and adoption of that agreement.

■ However, "[t]he time of accrual ... depends on whether the injured party chooses to treat the ... repudiation as a present breach."[103] If the party "[e]lects to place the repudiator in breach before the performance date, the accrual date of the cause of action is accelerated from [the] time of performance to the date of

---

**100.** Ross Aff. Ex. 28 § 5.08.

**101.** Section 1.1 of the BioVeris–Lili Merger Agreement states that "[u]pon the terms and subject to the conditions set forth in this Agreement, and in accordance with the [Delaware General Corporation Law ("DGCL")], at the Effective Time (as defined herein), [Lili Acquisition] shall be merged with and into [BioVeris], and the separate corporate existence of [Lili Acquisition] shall thereupon cease." Brown Aff. Ex. 4 § 1.1. The BioVeris–Lili Merger Agreement further provides:

> *Effective Time.* Subject to the provisions of this Agreement, as soon as practicable on the Closing Date, the parties shall file with the Secretary of State of the State of Delaware a certificate of merger executed in accordance with, and in such form as is required by, the relevant provisions of the DGCL .... The Merger shall become effective upon the filing of the Certificate of Merger or at such later time as is agreed to by the parties hereto and specified in the Certificate of Merger.

*Id.* § 1.3. Both parties agree that the merger "closed" on June 26, 2007. At this point, I do not have the Certificate of Merger in the evidentiary record. Drawing reasonable inferences in the light most favorable to the non-moving party, Meso, I conclude for purposes of summary judgment that the merger did not become effective until June 26, 2007. Therefore, the alleged assignment did not occur until that date.

**102.** *Restatement (Second) of Contracts* § 250 (1981); *see also* 1A *Corpus Juris Secundum* § 302 (2007) ("A cause of action arising out of contractual relations between the parties accrues as soon as the contract or agreement is breached, irrespective of any knowledge on the part of plaintiff or of any actual injury occasioned him or her. Ordinarily, the time for performance of the agreement must have expired, but where the agreement has been renounced or repudiated, or a party has placed performance beyond his or her power, intentionally or otherwise, there is such a breach as will at once give rise to a cause of action.") (citations omitted); 1 C. Corman, *Limitation of Actions* § 7.2.1, p. 488 (1991) ("An *anticipatory* breach of contract occurs when an obligor repudiates a duty before the time for the obligor's performance, and the aggrieved party elects, before completion of his or her performance, to consider the obligor's repudiation to be a present breach.").

**103.** *See* 1 C. Corman, *Limitation of Actions* § 7.2.1, p. 488 (1991); *see also Franconia Assocs. v. United States*, 536 U.S. 129, 143–44, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002); *Restatement (First) of Contracts* § 322 cmt. a (1932) ("The party injured is given an election whether he will regard an anticipatory repudiation as final."). *But see Phoenix Fin. Corp. v. Iowa–Wisconsin Bridge Co.*, 41 Del. (2 Terry) 130, 141–42, 16 A.2d 789 (Super.Ct.1940) ("We think the statute of limitations would not begin to run until some disavowal of the contract on the part of the defendant, or of some repudiation or dishonoring of the tickets by the defendant or someone in authority.").

such election."[104] If, however, the injured party instead opts to await performance, the "cause of action accrues, and the statute of limitations commences to run, from the time fixed for performance rather than from the earlier date of repudiation."[105] The rationale behind this rule is that the "failure to regard repudiation as final is advantageous to the wrongdoer, since he is thus given an enlarged opportunity of nullifying the effect of the repudiation ... and therefore should not work prejudice to the injured party in the calculation of the period of the Statute of Limitations."[106]

In this case, Roche could have nullified the effect of its repudiation by obtaining Meso's consent before the June 26, 2007 closing date when the alleged assignment by operation of law took place. But, Meso should not be prejudiced by the fact that Roche had an opportunity to nullify the effect of their repudiation. Moreover, under the record currently before me, I cannot find as a matter of undisputed fact that Meso objectively manifested an intent to treat the repudiation as a breach. Thus, for purposes of summary judgment, I assume that the cause of action did not accrue until June 26, 2007.

█ Using June 26, 2007 as the accrual date, Meso asserted its claims within the three-year limitations period. The "analogous statute of limitations provides a

presumption of what is reasonable."[107] Although Roche alleges that summary judgment should be granted based on laches because Meso's delay was unreasonable and prejudicial, Delaware courts presume, in the absence of exceptional circumstances, that an action filed within the analogous limitations period was neither the product of unreasonable delay nor the cause of undue prejudice.[108] "Whether or not [the elements of laches] exist is generally determined by a fact-based inquiry, and therefore summary judgment is rarely granted on a laches defense."[109] Based on the truncated record available at this point, therefore, I deny Roche's motion for summary judgment to the effect that Count I is barred by laches.

**2. Are rights, interests, or obligations relating to BioVeris's intellectual property subject to Section 5.08 of the Global Consent?**

**a. Does the plain language of the Global Consent make clear that Section 5.08 is limited to the assignment of rights, interests, or obligations created by the Global Consent itself?**

Roche argues that the plain language of the Global Consent indicates that Section 5.08 covers only "rights, interests or obli-

---

104. *See* 1 C. Corman, *Limitation of Actions* § 7.2.1, pp. 488–89 (1991).

105. *Id.* at p. 488.

106. *Restatement (First) of Contracts* § 322 cmt. a (1932).

107. *See In re Transamerica Airlines, Inc.,* 2007 WL 1555734, at *15 (Del.Ch. May 25, 2007).

108. *Whittington v. Dragon Gp., LLC,* 991 A.2d 1, 9 (Del.2009); *see also Reid v. Spazio,* 970 A.2d 176, 183 (Del.2009); *Bovay v. H.M. Byllesby & Co.,* 12 A.2d 178, 190 (Del.Ch. 1940) ("Statutes of limitations, strictly as such, are not binding on Courts of Equity,

but, in the absence of peculiar circumstances, clearly making the application of any such rule inequitable and unjust, it seems that the time fixed by the analogous statutory provision, barring a right of action in a Court of Law, will ordinarily be followed in determining whether the complainant has been guilty of laches."); *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC,* 2012 WL 3201139, at *15 (Del.Ch. Aug. 7, 2012).

109. *See Tafeen v. Homestore, Inc.,* 2004 WL 556733, at *8 (Del.Ch. Mar. 16, 2004) (internal quotation marks and citations omitted).

gations" created by the Global Consent itself. Meso, on the other hand, avers that Section 5.08 was intended to cover the rights and interests in IGEN's intellectual property.

Roche advances three arguments in support of its interpretation of Section 5.08. First, Roche argues that the term "Agreement" is defined as "the Global Consent and Agreement," and, therefore, the requirement in Section 5.08 for consent in order to assign rights, interests, or obligations "under this Agreement" means under the Global Consent itself. Roche also points out that the eleven other Transaction Agreements use the term "this Agreement" to refer to the rights created by each specific agreement. Second, Defendants contend that if Section 5.08 had been intended to govern the assignments of rights created under the other Transaction Agreements, it would have been unnecessary to include the non-assignment provisions contained in those other agreements. Finally, Defendants argue that it would be unreasonable to construe the use of "boilerplate" anti-assignment language to have created the broad blocking rights Meso now claims.

In opposition, Meso contends that "*under* this Agreement" has a broad meaning that would incorporate rights, interests, or obligations "within the grouping or designation of" the Global Consent. According to Meso, the proviso, which carves out the transfer of rights from the private LLC BioVeris to the public corporation BioVeris, shows that Roche's narrow construction of Section 5.08 is unreasonable because the rights transferred during the conversion were not created by the Global Consent itself. Meso also argues that the Global Consent was intended to be "global" in scope. Finally, Meso asserts that Roche's disparagement of Section 5.08 as "boilerplate" is irrelevant because boilerplate terms are both valid and enforceable.

Taking the contract as a whole, and giving effect to each and every term, the overall structure of the Global Consent amply supports construing the "rights, interests or obligations" referenced in Section 5.08 as encompassing the rights and interests in IGEN's intellectual property. While Roche argues that "rights, interests or obligations" refer to "rights, interests or obligations" created by the Global Consent itself,[110] Roche has not identified persuasively what those rights, interests, or obligations might be. At the motion to dismiss stage, however, Roche argued that "[t]he 'right' created under [Section 3.02(b) of the Global Consent] was the right to transfer those interests—not the interests themselves."[111] On the pending motion for summary judgment, Roche asserted that the non-assignment provision's "effect was limited to the four corners of [the Global Consent] and had no application to Roche's acquisition of BioVeris in 2007."[112] In other words, the only interpretation proffered by Roche is that Section 5.08 was intended to prevent the assignment of the right to transfer the interests in Article 3 of the Global Consent. Such a reading does not comport with the *plural* reference to rights, interests, and obligations.[113] Moreover, Roche's reading of the Global Consent would make the reference to interests and obligations mere surplusage in contravention of well-recognized contract construction principles. For these reasons, I am not convinced that Roche's in-

---

110. Defs.' Opening Br. 22.

111. Br. in Supp. of Defs.' Mot. to Dismiss 18.

112. Defs.' Opening Br. 30–31.

113. Ross Aff. Ex. 29 § 5.08.

terpretation of Section 5.08 is reasonable.[114]

More likely, "rights, interests or obligations" refers to the "right, title and interest in and to any and all intellectual property and other proprietary and confidential information or materials owned by [IGEN] ... to which MSD [or] MST ... has any direct or indirect rights or benefits ... pursuant to the MSD Agreements."[115] In simpler terms, MSD and MST consented in the Global Consent to the transfer of IGEN's intellectual property to which MSD or MST at least arguably had an interest. In that context, I consider Meso's reading of Section 5.08 to be reasonable. That is, one reasonable interpretation of the non-assignment provision is that it was intended to prohibit further assignment of those rights and interests, including IGEN's rights and interests in the Joint Venture Agreement and MSD License, by operation of law or otherwise, without the written consent of the other parties.

To the extent that rights and interests in intellectual property were exclusively licensed to MSD through the MSD License, for example, those rights and interests would be included in Section 5.08's prohibition. In any event, however, to make its claim in Count I, Meso still would have to prove at trial that the merger of Lili Acquisition into BioVeris involved an assignment of rights to which MSD and MST had a direct or indirect interest under the MSD Agreements.

### 3. Did the BioVeris Merger constitute an assignment "by operation of law or otherwise" under Section 5.08?

 Roche argues that even if this Court concludes that Section 5.08 applies to the assignment of rights, interests, or obligations relating to BioVeris's intellectual property, Roche still is entitled to summary judgment on Count I because no assignment by operation of law or otherwise occurred when Roche acquired BioVeris through a reverse triangular merger. Specifically, Roche asserts that BioVeris remained intact as the surviving entity of the merger, and, therefore, BioVeris did not assign anything. Meso, on the other hand, contends that mergers generally, including reverse triangular mergers, can result in assignments by operation of law.

At the motion to dismiss stage, I noted that Section 5.08 does not require Meso's consent for changes in ownership, but prohibits, absent consent from MSD and MST, an assignment of BioVeris's rights and interests *by operation of law or otherwise*.[116] I concluded that no Delaware case squarely had addressed whether a reverse triangular merger could ever be viewed as an assignment by operation of law.[117] I further stated that "Plaintiffs plausibly argue that 'by operation of law' was intended to cover mergers that effectively operated like an assignment, even if it might not apply to mergers merely involving changes of control."[118]

 To interpret an anti-assignment provision, a court "look[s] to the language of the agreement, read as a whole, in an

---

114. *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del.2010) ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

115. *See* Ross Aff. Ex. 29 § 3.02(e); *see also id.* § 3.02(b).

116. *Meso Scale Diagnostics, LLC v. Roche Diagnostics GMBH*, 2011 WL 1348438, at *10 (Del.Ch. Apr. 8, 2011).

117. *Id.*

118. *Id.* at *13.

effort to discern the parties' collective intent."[119] Roche contends that the language "by operation of law or otherwise" makes clear that the parties did not intend Section 5.08 to cover reverse triangular mergers. I find Roche's interpretation of Section 5.08 to be reasonable. Generally, mergers do not result in an assignment by operation of law of assets that began as property of the surviving entity and continued to be such after the merger.

Upon the completion of a merger, Section 259 of the DGCL [120] provides:

When any merger or consolidation shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of all the constituent corporations, or of all such constituent corporations *except the one into which the other or others of such constituent corporations have been merged,* as the case may be, shall cease and the constituent corporations shall become a new corporation, or be merged into 1 of such corporations ... the rights, privileges, powers and franchises of each of said corporations, and all property, real, personal and mixed, and all debts due to any of said constituent corporations on whatever account ...

*shall be vested in the corporation surviving or resulting from such merger or consolidation;* and all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation as they were of the several and respective constituent corporations.[121]

In *Koppers Coal & Transport Co. v. United States,*[122] the United States Court of Appeals for the Third Circuit concluded that "the underlying property of the constituent corporations is transferred to the resultant corporation upon the carrying out of the consolidation or merger as provided by Section 59."[123] Other courts in Delaware have held that Section 259(a) results in the transfer of the *non-surviving corporation's* rights and obligations to the surviving corporation by operation of law.[124] For example, in *DeAscanis v. Brosius–Eliason Co.,*[125] the Delaware Supreme Court associated Section 259 with assignments by operation of law.[126] The language in Section 259, "except the one into which the other or others of such constituent corporations have been merged," however, suggests that the sur-

119. *Tenneco Automotive Inc. v. El Paso Corp.,* 2002 WL 453930, at *1 (Del.Ch. Mar. 20, 2002).

120. 8 *Del. C.* § 259.

121. *Id.* § 259(a) (emphasis added).

122. 107 F.2d 706 (3d Cir.1939).

123. *Id.* at 708 (referring to Del. Rev.Code 1935, § 2092, a precursor to 8 *Del. C.* § 259(a)).

124. *See Heit v. Tenneco, Inc.,* 319 F.Supp. 884, 887 (D.Del.1970) ("8 *Del. C.* § 259 provides that when a merger becomes effective all assets of the merged corporation, including any causes of action which might exist on its behalf, pass by operation of law to the surviving company."); *Levitt v. Bouvier,* 287 A.2d 671, 673 (Del.1972) ("Upon the formation of American Mushroom Corporation, the rights of the constituent corporations based on the warranties passed to their successor, American, pursuant to the agreement of merger and 8 *Del. C.* § 259."); *see also* 2 David A. Drexler, Lewis S. Black Jr. & A. Gilchrist Sparks, III, Delaware Corporation Law and Practice § 35.07 (2010) ("Section 259 provides that the rights and liabilities of the constituent corporations in a merger pass by operation of law to the surviving corporation.").

125. 533 A.2d 1254, 1987 WL 4628 (Del.1987) (ORDER).

126. *Id.* at *2.

viving corporation would not have effected any assignment. In sum, Section 259(a) supports Roche's position that a reverse triangular merger generally is not an assignment by operation of law or otherwise, and that, therefore, Section 5.08 was not intended to cover reverse triangular mergers.

I also note that Roche's interpretation is consistent with the reasonable expectations of the parties. Pursuant to the widely accepted "objective theory" of contract interpretation—a framework adopted and followed in Delaware—this Court must interpret a contract in a manner that satisfies the "reasonable expectations of the parties at the time they entered into the contract."[127] The vast majority of commentary discussing reverse triangular mergers indicates that a reverse triangular merger does not constitute an assignment by operation of law as to the surviving entity. For example, this Court has recognized that "it is possible that the only practical effect of the [reverse triangular] merger is the conversion of the property interest of the shareholders of the target corporation."[128] Similarly, in *Lewis v. Ward*,[129] then-Vice Chancellor Strine observed:

In a triangular merger, the acquiror's stockholders generally do not have the right to vote on the merger, nor are they entitled to appraisal. If a reverse triangular structure is used, the rights and obligations of the target are not transferred, assumed or affected. Because of these and other advantages to using a triangular structure, it is the preferred method of acquisition for a wide range of transactions.[130]

Leading commentators also have noted that a reverse triangular merger does not constitute an assignment by operation of law.[131] Based on the commentary on this subject, I consider it unlikely that the parties would have expected a clause covering assignments by operation of law to have applied to reverse triangular mergers.

Meso disagrees and has advanced three theories in support of its interpretation of Section 5.08, *i.e.*, that the anti-assignment clause was intended to cover reverse triangular mergers. Those theories are: (1) the acquisition of BioVeris was nothing more than the assignment of BioVeris's intellectual property rights to Roche; (2) Delaware case law regarding forward triangular mergers compels the conclusion that a provision covering assignment "by

127. *The Liquor Exchange, Inc. v. Tsaganos*, 2004 WL 2694912, at *2 (Del.Ch. Nov. 16, 2004).

128. *Wells Fargo & Co. v. First Interstate Bancorp*, 1996 WL 32169, at *7 (Del.Ch. Jan. 18, 1996).

129. 2003 WL 22461894 (Del.Ch. Oct. 29, 2003).

130. *Id.* at *4 n. 18.

131. *See, e.g.*, 1 R. Franklin Balotti & Jesse A. Finkelstein, Delaware Law of Corporations and Business Organizations § 9.8 (2013) ("The advantage of this type of merger is that T will become a wholly-owned subsidiary of A without any change in its corporate existence.

Thus, the rights and obligations of T, the acquired corporation, are not transferred, assumed or affected. For example, obtaining consents for the transfer of governmental or other licenses may not be necessary, absent a provision to the contrary in the licenses or agreement, since the licenses will continue to be held by the same continuing corporation."); Elaine D. Ziff, *The Effect of Corporate Acquisitions on the Target Company's License Rights*, 57 Bus. Law. 767, 787 (2002) ("One widely-recognized advantage of employing a reverse subsidiary structure is that it purportedly obviates the issue of whether the merger constitutes a transfer of the target company's assets in violation of existing contracts, because the 'surviving company' is the same legal entity as the original contracting party.").

operation of law" extends to all mergers; and (3) this Court should embrace a California federal court's holding that a reverse triangular merger results in an assignment by operation of law.

First, Meso contends that "the acquisition of BioVeris was nothing more than the assignment of BioVeris's intellectual property rights to Roche" because, as a result of the acquisition, Roche Diagnostics effectively owned the ECL patents.[132] Meso's argument, however, is unavailing because it ignores Delaware's longstanding doctrine of independent legal significance. That doctrine states:

> [A]ction taken in accordance with different sections of [the DGCL] are acts of independent legal significance even though the end result may be the same under different sections. The mere fact that the result of actions taken under one section may be the same as the result of action taken under another section does not require that the legality of the result must be tested by the requirements of the second section.[133]

Indeed, the doctrine of independent legal significance has been applied in situations where deals were structured so as to avoid consent rights. For example, in *Fletcher International, Ltd. v. ION Geophysical Corp.*,[134] this Court noted:

> [T]he fact that one deal structure would have triggered [Plaintiff's] consent rights, and the deal structure in the Share Purchase Agreement did not,

does not have any bearing on the propriety of the Share Purchase Agreement or the fact that under that Agreement, [Plaintiff's] consent rights did not apply. This conclusion, for contract law purposes, is analogous to results worked by the "doctrine of independent legal significance" in cases involving similar statutory arguments made under the DGCL.[135]

Here, Lili Acquisition was merged into BioVeris, with BioVeris as the surviving entity.[136] Under Section 259, the surviving entity continued to "possess[ ] all the rights, privileges, powers and franchises" it had before the merger plus those of each of the corporations merged into it. Thus, no assignment by operation of law or otherwise occurred as to BioVeris with respect to what it possessed before the merger.[137]

Meso also avers that this Court should look to Delaware's forward triangular merger cases for the propositions (1) that a provision covering assignment "by operation of law" extends to *all* mergers[138] and (2) that this Court should assess whether Meso was adversely harmed in construing the parties' intent. Meso relies primarily on two cases for that proposition: *Star Cellular Telephone Co. v. Baton Rouge CGSA, Inc.*[139] and *Tenneco Automotive Inc. v. El Paso Corp.*[140]

In *Star Cellular*, the Star Cellular Telephone Company, Inc. ("Star Cellular") and

132. Pls.' Answering Br. 34.

133. *Orzeck v. Englehart*, 195 A.2d 375 (Del. 1963).

134. 2011 WL 1167088 (Del.Ch. Mar.29, 2011).

135. *Id.* at *5 n. 39.

136. Brown Aff. Ex. 4 § 1.1.

137. *See* 8 *Del. C.* § 259(a).

138. Pls.' Answering Br. 32 ("Under Delaware law, mergers result in assignments by operation of law.").

139. 1993 WL 294847 (Del.Ch. Aug. 2, 1993), *aff'd*, 647 A.2d 382, 1994 WL 267285 (Del. 1994) (ORDER).

140. 2002 WL 453930 (Del.Ch. Mar. 20, 2002).

Capitol Cellular, Inc. ("Capitol Cellular") were limited partners in the Baton Rouge MSA Limited Partnership. Baton Rouge CGSA, Inc., the original general partner, could "transfer" its interest as a general partner only after written notice to all the other partners and a unanimous vote of the other partners.[141] Baton Rouge CGSA, Inc. ultimately was merged into Louisiana CGSA Inc. through a forward triangular merger. Star Cellular and Capitol Cellular sued, alleging that the merger constituted a prohibited "transfer" of Baton Rouge's general partnership interest. The Court of Chancery first noted that "[a]s a general matter in the corporate context, the phrase 'assignment by operation of law' would be commonly understood to include a merger."[142] Nonetheless, the Court held that it "will not attribute to the contracting parties an intent to prohibit the Merger where the transaction did not materially increase the risks to or otherwise harm the limited partners."[143] The Court also noted that "where an antitransfer clause in a contract does not explicitly prohibit a transfer of property rights to a new entity by a merger, and where performance by the original contracting party is not a material condition and the transfer itself creates no unreasonable risks for the other contracting parties, the court should not presume that the parties intended to prohibit the merger."[144] Thus, the trial court in *Star Cellular* concluded that the challenged merger did not constitute a prohibited transfer.

The Supreme Court affirmed the Court of Chancery's decision and summarized the lower Court's ruling as follows:

The court found that the term "transfer" in the anti-transfer provision has no "generally prevailing meaning." The court determined that the assets of Baton Rouge, including its General and Limited Partnership Interest, were transferred to Louisiana by operation of law. The trial court rejected a "mechanical" interpretation of the term "transfer," adopting the criticism of such an analysis found in certain legal journals. The Court of Chancery held that there was an ambiguity as a matter of law, and that the Partnership Agreement did not expressly include transfers by operation of law in its anti-transfer provision.[145]

The Supreme Court then summarily held that: "This is a contract case, and we agree that an ambiguity exists in the Partnership Agreement. The Court of Chancery correctly dealt with that ambiguity."[146]

In *Tenneco Automotive*,[147] the Court of Chancery examined the enforcement of an insurance agreement. While that action was ongoing, the plaintiff merged into a successor entity through a forward triangular merger. The original insurance agreement contained an anti-assignment

---

141. *Star Cellular*, 1993 WL 294847, at *3. The specific provision stated:

> The General Partner may transfer or assign its General Partner's Interest only after written notice to all the other Partners and the unanimous vote of all the other Partners to permit such transfer and to continue the business of the Partnership with the assignee of the General Partner as General Partner.
> *Id.*

142. *Id.* at *2.

143. *Id.* at *11.

144. *Id.* at *8.

145. *Star Cellular Telephone Co. v. Baton Rouge CGSA, Inc.*, 647 A.2d 382, 1994 WL 267285, at *3 (Del.1994) (ORDER).

146. *Id.*

147. 2002 WL 453930 (Del.Ch. Mar. 20, 2002).

provision which stated that "no party hereto may assign or delegate, whether by operation of law or otherwise, any of such party's rights or obligations under or in connection with this [insurance agreement] without the written consent of each other party hereto."[148] The Court concluded that the anti-assignment provision was ambiguous based on a tension that existed between the language of that provision and that of the whole agreement.[149] Having concluded that the provision was ambiguous, the Court applied the approach adopted in *Star Cellular*, and noted that the defendant "has not identified any adverse consequences that may befall it from the merger."[150] Therefore, the Court found that the parties did not intend to preclude the challenged acquisition of rights under the insurance agreement, and granted a motion to substitute the successor entity as the plaintiff.[151]

Although both *Star Cellular* and *Tenneco* involved a transfer assignment by operation of law, each of those decisions involved a finding that the non-consenting party had not been adversely harmed and that the parties had not intended to require consent to the challenged transaction. It is important to note, however, that the broad statement in *Tenneco* that an assignment by operation of law commonly would be understood to include a merger, appears to rely on *DeAscanis v. Brosius–Eliason Co.*[152] The *DeAscanis* case focused on Section 259 and mergers in connection with which assignments were made by non-surviving constituent entities. Indeed, *Tenneco* acknowledged that, under

Section 259, the corporation that was merged into the second corporation "cease[d] to exist."[153] Thus, both *Tenneco* and *Star Cellular* are distinguishable because they involved forward triangular mergers where the target company was not the surviving entity, whereas in this case BioVeris was the surviving entity in a reverse triangular merger.

In both cases, after reading the agreement as a whole, the Court found the anti-assignment language at issue to be ambiguous. The anti-assignment provisions on their own indicated that consent might be required because there had been assignments as a matter of law. In light of other inconsistencies, however, the Court ultimately determined the agreements to be ambiguous. In this case, on the other hand, there was no assignment by operation of law or otherwise. Furthermore, upon examination of Section 5.08, the Global Consent, and the related Transaction Agreements, there are no comparable inconsistencies that might support an inference that the parties intended to depart from the principle that a reverse triangular merger is not an assignment by operation of law. To the contrary, there was a recognition that Roche might acquire BioVeris.

Meso also contends that the proviso at the end of Section 5.08 made clear "that even mere changes of corporate form would result in prohibited assignments (but for the express exception),"[154] and that, therefore, any merger also would result in a prohibited assignment. The

---

148. *Id.* at *1.

149. *Id.* at *3.

150. *Id.* at *4.

151. *Id.*

152. *Tenneco*, 2002 WL 453930, at *2 n. 6 (citing *DeAscanis v. Brosius–Eliason Co.*, 533 A.2d 1254, 1987 WL 4628 (Del.1987) (ORDER)).

153. *Id.* at *2.

154. Pls.' Answering Br. 33.

conversion of an LLC to a corporation, however, is distinguishable from a reverse triangular merger in that a conversion results in a change in the corporate form. A reverse triangular merger does not.[155] Even if Meso were correct that the proviso reflected the parties' intent that a change in corporate form would constitute an assignment, that conclusion has no bearing on reverse triangular mergers, which do not result in a change in corporate form. Moreover, the proviso arguably operated as a cautious, "belt and suspenders" reaction to a concern that Meso might attempt to extract hold-up value from the contemplated conversion of Newco into a corporation. For these reasons, I conclude that the proviso to Section 5.08 does not create an ambiguity as to whether the "assignment by operation of law or otherwise" language was intended to cover the reverse triangular merger in this case. Thus, Meso has not shown that its proposed interpretation of Section 5.08, like Roche's, is a reasonable one in the circumstances of this case.

As a final argument, Meso suggests that this Court should embrace the United States District Court for the Northern District of California's holding in *SQL Solutions, Inc. v. Oracle Corp.*[156] that a reverse triangular merger results in an assignment by operation of law.[157] There the court stated, "an assignment or transfer of rights does occur through a change in the legal form of ownership of a business." [158] The court in *SQL Solutions* applied California law and cited a line of California cases for the proposition that whether "an assignment results merely from a change in the legal form of ownership of a business ... depends upon whether it affects the interests of the parties protected by the nonassignability of the contract." [159]

I decline to adopt the approach outlined in *SQL Solutions*, however, because doing so would conflict with Delaware's jurisprudence surrounding stock acquisitions, among other things. Under Delaware law, stock purchase transactions, by themselves, do not result in an assignment by operation of law. For example, in the *Baxter Pharmaceutical Products* case,[160] this Court stated, "Delaware corporations may lawfully acquire the securities of other corporations, and a purchase or change of ownership of such securities (again, without more) is not regarded as assigning or delegating the contractual rights or duties of the corporation whose securities are purchased." [161] Similarly, in *Branmar*

155. *See* 8 *Del. C.* § 259(a). Indeed, before 2006, the conversion of an LLC to a corporation arguably could have resulted in a discontinuity in the existence of the converted LLC. Notably, in 2006, 6 *Del. C.* § 18–216(c) was amended to clarify that situation by adding the following sentence: "When a limited liability company has converted to another entity or business form pursuant to this section, for all purposes of the laws of the State of Delaware, the other entity or business form shall be deemed to be the same entity and the conversion shall constitute a continuation of the existence of the limited liability company in the form of such other entity or business form."

156. 1991 WL 626458 (N.D.Cal. Dec. 18, 1991).

157. *See* Tr. 72.

158. *SQL Solutions, Inc. v. Oracle Corp.,* 1991 WL 626458, at *3.

159. *See Trubowitch v. Riverbank Canning Co.,* 30 Cal.2d 335, 344–45, 182 P.2d 182 (1947); *see also People ex rel. Dep't of Pub. Works v. McNamara Corp.,* 28 Cal.App.3d 641, 648, 104 Cal.Rptr. 822 (1972).

160. *Baxter Pharm. Prods., Inc. v. ESI Lederle Inc.,* 1999 WL 160148 (Del.Ch. Mar. 11, 1999).

161. *Id.* at *5 (internal citations omitted) ("The nonassignability clause contains no language that prohibits, directly or by implication, a stock acquisition or change of ownership of any contracting party.").

*Theatre Co. v. Branmar, Inc.,*[162] the Court held that "in the absence of fraud ... transfer of stock of a corporate lessee is ordinarily not a violation of a clause prohibiting assignment...."[163]

Delaware courts have refused to hold that a mere change in the legal ownership of a business results in an assignment by operation of law. *SQL Solutions*, on the other hand, noted, "California courts have consistently recognized that an assignment or transfer of rights does occur through a change in the legal form of ownership of a business."[164] The *SQL Solutions* case, however, provides no further explanation for its apparent holding that any change in ownership, including a reverse triangular merger, is an assignment by operation of law. Both stock acquisitions and reverse triangular mergers involve changes in legal ownership, and the law should reflect parallel results. In order to avoid upsetting Delaware's well-settled law regarding stock acquisitions, I refuse to adopt the approach espoused in *SQL Solutions.*

In sum, Meso could have negotiated for a "change of control provision." They did not. Instead, they negotiated for a term that prohibits "assignments by operation of law or otherwise." Roche has provided a reasonable interpretation of Section 5.08 that is consistent with the general understanding that a reverse triangular merger is not an assignment by operation of law. On the other hand, I find Meso's arguments as to why language that prohibits "assignments by operation of law or otherwise" should be construed to encompass

reverse triangular mergers unpersuasive and its related construction of Section 5.08 to be unreasonable.

For the foregoing reasons, I conclude that Section 5.08 was not intended to cover the BioVeris Merger and that Roche is entitled to summary judgment in its favor as to Count I.

## B. Count II: Breach of the Roche License

In Count II of the Complaint, Meso seeks damages against Roche for breach of the Roche License for marketing and selling ECL products outside of the field. Plaintiffs aver that because they "joined in" the Roche License, they are entitled to enforce the provisions of the Roche License, including Section 2.6 whereby Roche "covenant[ed] that it will not, under any circumstances, actively advertise or market the Products in fields other than those included in the Field."[165] Roche urges this Court to grant summary judgment on Count II because Meso was not a party to the Roche License, and, therefore, cannot enforce the rights in the Roche License. Specifically, Roche argues that: (1) this Court is bound by the Arbitration Panel's finding that MSD was not, and was not intended to be, a party to the arbitration provisions; (2) under the plain language of the Roche License, MSD and MST are not parties to the Roche License; and (3) extrinsic evidence confirms that MSD and MST are not parties to the Roche License.[166] I address each of these points in turn.

---

162. 264 A.2d 526 (Del.Ch.1970).

163. *Id.* at 528.

164. *SQL Solutions, Inc.,* 1991 WL 626458, at *3. It is not entirely clear whether the *SQL* court intended to distinguish between a change in legal ownership and a "change in the legal form of ownership." As I under-

stand it, the *SQL* court intended the latter phrase to include the former.

165. Ross Aff. Ex. 29 § 2.9.

166. In other words, Defendants seek summary judgment because the contract is unambiguous and the extrinsic evidence fails to create a triable issue of material fact. *See*

### 1. Are the findings of the Arbitration Panel binding?

In my Memorandum Opinion dated April 8, 2011, I referred the question of whether Count II was arbitrable to the Arbitration Panel and stayed further proceedings on that Count pending the Panel's decision.[167] On September 10, 2012, the Panel ruled that Meso's claim for breach of the Roche License, *i.e.*, Count II, is not arbitrable.[168] Specifically, the Panel's decision stated that:

> The claims asserted by [MSD] in this arbitration are hereby dismissed without prejudice to their being asserted in a court, based on this arbitration panel's finding/conclusion that said claims are not arbitrable, it being understood that this Award is not intended to resolve or reflect upon the merits of such claims as they may be presented in a court.[169]

On November 5, 2012, I confirmed the Arbitration Panel's narrow holding that Meso's "claims are not arbitrable and that the parties' costs and expenses of this arbitration shall be borne by the parties."[170] I did not address, however, the extent to which the Panel's award might have any res judicata or claim-preclusive effect or any collateral estoppel or issue-preclusive effect in this action.

Roche contends that the Arbitration Panel found that Meso was not, and was not intended to be, a party to the Roche License. Roche notes that the neutral chairman of the Arbitration Panel, Arbitrator Charles J. Moxley, Jr.,[171] wrote in a concurrence:

> There is no basis under the arbitration provisions of the [Roche License], the [Roche License] itself, the Consent, the parol evidence in this case, the bases upon which Meso and Roche tried the Phase I hearing, or applicable law for concluding that the criteria for Meso's being a party to the arbitration provisions of the [Roche License] are in any material way different from those applicable to its being a party to the Agreement more generally.[172]

Roche contends I am bound by that determination under the doctrine of collateral estoppel.

 "Under Delaware law a judgment in one cause of action is conclusive in a subsequent and different cause of action as to a question of fact actually litigated by the parties and determined in the first action."[173] "Briefly stated, the three elements to a collateral estoppel are: (1) a determination of fact; (2) in a prior action;

*GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *4 (Del.Ch. June 21, 2012) ("In cases involving questions of contract interpretation, a court will grant summary judgment under either of two scenarios: when the contract in question is unambiguous, or when the extrinsic evidence in the record fails to create a triable issue of material fact and judgment as a matter of law is appropriate.").

167. *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 2011 WL 1348438, at *15 n. 108, *18 (Del.Ch. Apr. 8, 2011).

168. Pls.' Opp'n to Defs.' Mot. to Confirm Final Award of Arbitrators Ex. A, Final Award of Arbitrators, 3.

169. Final Award of Arbitrators 38.

170. Tr. 102.

171. The Arbitration Panel consisted of three arbitrators: one appointed by each of the opposing parties and a third arbitrator appointed by the other two. Brown Aff. Ex. 3 § 6.2(c). The third arbitrator was Mr. Moxley.

172. Final Award of Arbitrators 19.

173. *E.B.R. Corp. v. PSL Air Lease Corp.*, 313 A.2d 893, 894 (Del.1973).

(3) between the same parties." [174] For the reasons set forth below, the Arbitration Panel's determination is entitled to only very limited collateral estoppel or issue-preclusive effect in this action.

First, Arbitrator Moxley's concurrence was neither a determination by the Arbitration Panel nor a finding necessary to the Arbitration Panel's holding. "Under the doctrine of collateral estoppel, if a court has decided an issue of fact *necessary* to its judgment, that decision precludes relitigation of the issue in a suit on a different cause of action involving a party to the first case." [175] Because a concurring opinion is not necessary to a holding, I am not bound by Arbitrator Moxley's statements.

Moreover, the Arbitration Panel, in its majority decision, stated that Meso's claims were "dismissed without prejudice to their being asserted in a court," and that their Award was "not intended to resolve or reflect upon the merits of such claims as they may be presented in a court." [176]

Indeed, once an arbiter concludes that a claim is not arbitrable, the arbiter does not have jurisdiction to resolve other disputes. As the Supreme Court of the United States observed in *First Options of Chicago, Inc. v. Kaplan,*[177] "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes— that the parties have agreed to submit to arbitration" and "a party who has not agreed to arbitrate will normally have a right to a court's decision about the merits of its dispute." [178]

The Arbitration Panel was tasked with determining whether or not the dispute as to Count II was arbitrable. The Panel ultimately determined that they did not have jurisdiction to hear the Roche License claims. They based that determination, at least in part, on a finding that when MSD and MST consented to and "join[ed] in the licenses granted" in the Roche License, they did not also become parties to the arbitration provision in that agreement. That finding is entitled to issue-preclusive effect here. To the extent the Arbitration Panel may have opined on topics outside of their jurisdictional inquiry, however, this Court is not bound by those statements. Therefore, I reject, for example, Roche's argument that Arbitrator Moxley's suggestion in his concurrence that MSD and MST were not parties to the Roche License precludes litigation of that issue in this action.[179]

2. **Does the plain language of the Roche License show that MSD and MST are not parties to the Roche License?**

Roche also seeks summary judgment on the basis that the plain language of the Roche License and Meso Consent unambiguously indicates that MSD and MST are not parties to the agreement, and that,

174. *Id.* at 895.

175. *Messick v. Star Enter.*, 655 A.2d 1209, 1211 (Del.1995) (emphasis added).

176. Final Award of Arbitrators 38.

177. 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

178. *Id.* at 942–43, 115 S.Ct. 1920.

179. *See Chambers Belt Co. v. Tandy Brands Accessories, Inc.*, 2012 WL 3104396, at *4 (Del.Super. July 31, 2012) ("[T]he only finding that could be given either *res judicata* or collateral estoppel effect is that the disagreement is not arbitrable due to a lack of compliance with the timing requirements of the APA.").

therefore, MSD and MST cannot enforce the Roche License.

Roche cites the following elements of the Roche License, among others, to support its position that MSD and MST are non-parties. First, the Roche License provides that it is made "by and between IGEN International ... and IGEN LS." [180] Second, "Parties" is a defined term that includes only IGEN LS and IGEN International. [181] Moreover, the Roche License provides that:

> Except for the provisions of Section 2.2(a) related to immunity from suit and Article 9 relating to Indemnitees, nothing contained in this Agreement is intended to confer upon any other than the Parties hereto and their respective successors and permitted assigns, any benefit, right or remedy under or by reason of this Agreement. [182]

Finally, the signature page to the Roche License contained signature lines only for officers of IGEN LS and IGEN International. [183] Roche further contends that, as non-parties to the Roche License, MSD and MST have no standing to pursue claims for breach of that agreement. [184]

Meso, on the other hand, relies on the Meso Consent that immediately followed the IGEN LS and IGEN International signature page. The Meso Consent stated that MSD and MST "consent to the fore-going License Agreement ... and hereby consent to and *join in the licenses granted* to [IGEN LS] and its Affiliates in the License Agreement." [185] Meso avers that because MSD and MST "join[ed] in the licenses granted," they are entitled to enforce the entire Roche License or, at the very least, Article 2 thereof entitled "Grant and Scope of the Licenses." Finally, Meso points out that the Roche License was "subject to the terms and conditions of this Agreement." [186]

Preliminarily, I note that the Roche License states that it "is made in accordance with and shall be governed and construed under the laws of the State of New York, U.S.A., without regard to conflicts of laws rules." [187] Consequently, I interpret both the Roche License and the attached Meso Consent in accordance with New York law. In New York, "[w]hether a contract is ambiguous is a question of law and extrinsic evidence may not be considered unless the document itself is ambiguous"; however, "when parties set down their agreement in a clear, complete document, their writing should ... be enforced according to its terms." [188]

New York courts have held that mere consent to an agreement does not make one a party to that agreement. [189] MSD and MST, however, arguably did more than merely consent to the Roche License, they "join[ed] in the licenses granted." A

---

180. Brown Aff. Ex. 3 at 1.

181. *Id.*

182. *Id.* § 14.11.

183. *Id.* at 0055886.

184. *See* Defs.' Opening Br. 45 (citing *Parker & Waichman v. Napoli*, 29 A.D.3d 396, 815 N.Y.S.2d 71, 74 (1st Dept.2006)).

185. Brown Aff. Ex. 3 at 0055887 (emphasis added).

186. *Id.* § 2.1.

187. Ross Aff. Ex. 29 § 6.4.

188. *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528, 837 N.Y.S.2d 600, 868 N.E.2d 956 (2007) (internal citations and quotation marks omitted).

189. *See In re H.D. Baskind & Co.*, 26 Misc.2d 776, 203 N.Y.S.2d 701, 704 (N.Y.Sup.1960) (Rejecting motion to compel arbitration by stockholders who consented to an agreement).

number of New York cases and cases applying New York law have held that a party who joins a contract can enjoy the "same rights" as other parties. For example, in *Karabu Corp. v. Gitner*,[190] the United States District Court for the Southern District of New York held that a travel consolidator who executed a "joinder agreement" became a party to the agreement with the "same rights" as other parties to the agreement.[191] Similarly, in *Digene Corp. v. Ventana Medical Systems, Inc.*,[192] the United States District Court for the District of Delaware held that "New York law has long held that a signatory may be bound by, and thus a party to, a contract, even though the signatory is not named as a party in the body of the contract."[193] Finally, in *Institut Pasteur v. Chiron Corp.*,[194] the United States District Court for the District of Columbia, applying New York law, held that "[t]here is no authority for the notion that an individual or company can 'join in' a contract—at least in the sense of assuming obligations directly under the contract—in some capacity other than as a party."[195]

Roche, however, argues that those cases are distinguishable "because the parties to the agreements were either signatories to the agreement, joined the full agreement, or both."[196] While MSD and MST may not have joined the full agreement, they explicitly joined in "the licenses granted."

Indeed, Roche has not referenced a single New York case that holds that a party who joins in part of an agreement is not a party to any aspect of the agreement.[197] Under New York law, one who joins in an agreement without qualification is a party to the contract with rights and obligations under the contract. By analogy, one who joins in part of an agreement arguably has the right to enforce at least that part of the agreement.

Thus, Roche's argument that the plain language of the Roche License and attached Meso Consent unambiguously makes clear that IGEN and IGEN LS are the only two parties to the agreement is unavailing. The cases Meso relies on for the converse of that proposition do not turn on the question of whether the party seeking to enforce the provisions of an agreement is a party to that agreement. Rather, Meso's cases focus on whether the party "joined in" the agreement.

In that regard, Roche argues it still is entitled to summary judgment because the plain language of the Meso Consent unambiguously shows that MSD and MST "join[ed] in" only the "licenses granted," not in the entire 2003 License Agreement. While Roche does not explain what it means by only the "licenses granted," one of Roche's lawyers, Christian Steinmetz, testified before the Arbitration Panel that

190. 16 F.Supp.2d 319 (S.D.N.Y.1998).

191. *Id.* at 320.

192. 316 F.Supp.2d 174 (D.Del.2004).

193. *Id.* at 183.

194. 2005 WL 366968 (D.D.C. Feb. 16, 2005).

195. *Id.* at *11.

196. Defs.' Reply Br. in Supp. of Their Mot. for Summ. J. ("Defs.' Reply Br.") 21.

197. The cases cited by Defendants in their opening brief discuss the implications of consenting to an agreement, not joining in an agreement or part of an agreement. *See* Defs.' Opening Br. 45 (citing *In re H.D. Baskind & Co.*, 26 Misc.2d 776, 203 N.Y.S.2d 701, 704 (N.Y.Sup.1960); *La Chemise Lacoste v. Alligator Co.*, 374 F.Supp. 52 (D.Del.1974), *rev'd on other grounds*, 506 F.2d 339 (3d Cir. 1974); *Kansas City v. Milrey Dev. Co.*, 600 S.W.2d 660, 663–65 (Mo.Ct.App.1980)). The remaining cases relied upon by Defendants are from other jurisdictions, and deserve only limited weight. *See* Defs.' Reply Br. 27–28.

he believed that MSD and MST "did not join in all of Article 2," just Sections 2.1 and 2.7, *i.e.*, "the two granting provisions." [198] Article 2 of the Roche License, however, is titled "Grant and Scope of the Licenses." [199] A reasonable reading of the Roche License and the attached consent, therefore, is that Meso joined in the entire Article 2, including Section 2.6, which prohibited Roche from marketing products outside the defined field. Thus, I conclude that Roche's construction of the Roche License is not the only reasonable construction.

In sum, Roche has not shown that, as a matter of New York law, one who joins in part of an agreement cannot enforce the part of the agreement to which they subscribed. Moreover, the Roche License is ambiguous as to whether Meso joined into the entire article granting the licenses or just the granting provisions. For these reasons, I reject this "plain meaning" aspect of Roche's argument for summary judgment.

### 3. Does the extrinsic evidence require the conclusion that MSD and MST are not entitled to enforce the Roche License?

 Finally, Roche contends that it is entitled to summary judgment because the record conclusively shows that IGEN International and IGEN LS did not intend MSD and MST to be parties with the right to enforce the Roche License. In support of that argument, Roche cites the testimony of the lawyers and key negotiators of those documents. For example, Robert Waldman, an attorney for MSD and MST, testified that there were no discussions as to whether MSD or MST would be a party to the Roche License. [200] Moreover, Waldman stated that "[w]e weren't thinking of the possible consequences if Roche was not honoring the license—at least I wasn't." [201] Similarly, Daniel Abdun–Nabi, IGEN's general counsel, did not believe that MSD or MST was entitled to enforce the out-of-field sales provisions. [202]

In support of its opposing view, Meso emphasizes that James McMillan, an attorney for MSD and MST, stated that he understood the join-in language to reflect that Meso was granting a license to Roche. [203] Likewise, IGEN's CEO, Sam Wohlstadter, testified that he believed MSD and MST had an interest in the technology and were a party to the Roche License. [204]

Thus, the testimony and other evidence available on Roche's motion for summary judgment raise triable issues of material fact as to whether MSD and MST were intended to be parties to, or have enforcement rights under, the Roche License. Based on my conclusion *supra* that the meaning of the "join in the licenses granted" language in the Meso Consent attached to the Roche License is ambiguous, it will be necessary to consider extrinsic evidence on the question of MSD and MST's ability to enforce the Roche License. [205] Consequently, Meso is entitled to present this question at trial.

---

**198.** Ross Aff. Ex. 8 at 500.

**199.** *See id.* Ex. 29 art. 2.

**200.** Brown Aff. Ex. 66 at 1099.

**201.** *Id.* at 1115.

**202.** *Id.* Ex. 67 at 122–23.

**203.** *See* Ross Aff. Ex. 31 at 135 ("[I]t was at the very least Meso granting licenses to Roche.").

**204.** *Id.* Ex. 64 at 54–55.

**205.** *See United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834 (Del.Ch.2007); *U.S. West v. Time Warner Inc.*, 1996 WL 307445, at *10 (Del.Ch. June 6, 1996).

For all of the foregoing reasons, I deny Roche's motion for summary judgment as to Count II.

## III. CONCLUSION

For the reasons stated in this Opinion, I grant Roche's motion for summary judgment in its favor on Count I and deny the motion for summary judgment as to Count II.

**IT IS SO ORDERED.**